**John HARNETT, individually d/b/a Shamrock Greyhounds, Plaintiff,**

v.

**Carol J. PARRIS, Bob Parris, Carol Ann Long, and The National Greyhound Association, Defendants.**

No. 94–4251–SAC.

United States District Court, D. Kansas.

April 24, 1996.

Steve A. Schwarm, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, Harry A. Woods, Jr., Randy Gordon, Crowe & Dunlevy, Oklahoma City, OK, for plaintiff.

Robert L. Baer, Cosgrove, Webb & Oman, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant National Greyhound Association's motion for partial summary judgment (Dk. 48). The plaintiff brings this diversity action advancing claims of negligence, breach of contract, and outrage against the defendant National Greyhound Association ("NGA"). The plaintiff has dismissed his claim against the individual defendants. (Dk. 21, 23). The defendant NGA seeks summary judgment as to the plaintiff's outrage and punitive damage claims.

## SUMMARY JUDGMENT STANDARDS

■ A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment."

*Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

■ The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

■ More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evi-

dence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS

In his response to the motion for summary judgment, the plaintiff set out twelve paragraphs of facts under the heading, "Material Facts Controverting Defendant's Statement of Uncontroverted Facts," and he set out twenty additional paragraphs under the heading "Material Facts Omitted by Defendant." (Dk. 56 at 2–7). Neither group of facts in plaintiff's response, however, "state[s] the number of movant's fact that is disputed," as required by D.Kan. Rule 56.1.[1] Nor is it readily apparent from the plaintiff's response which of the movant's facts, if any, are controverted. The defendant in its reply brief pointed out this deficiency in the plaintiff's response.

██ Without leave of the court, the plaintiff filed a surreply and for the first time specifically controverted by number the defendant's statement of facts. The plaintiff offers no explanation for his failure to comply with D.Kan. Rule 56.1 in his original response. Moreover, the rules of this court do not provide for the filing of surreplies. D.Kan. Rule 7.1. The courts in this district do not permit a surreply without leave of the court, *see, e.g., Edwards v. Esau Investments, Inc.*, No. 93–4130–DES, 1994 WL 606073, at *5 (D.Kan. Oct. 31, 1994); *Dees v. Vendel*, No. 91–2482–EEO, 1994 WL 17951, at *1 (D.Kan. Jan. 13, 1994), and reserve leave for rare circumstances as "where a movant improperly raises new arguments in a reply," *E.E.O.C. v. International Paper Co.*, No. 91–2017–L, 1992 WL 370850 (D.Kan. Oct. 28, 1992). Under the circumstances, the court disregards the matters argued and pre-

sented in the plaintiff's surreply and the defendant's surreply.[2]

For purposes of only this motion for partial summary judgment, the court considers the following facts to be uncontroverted.

The NGA is a non-profit association established to create uniformity of registration of greyhound dogs throughout the United States. The NGA "maintain[s] a registry recording the breedings, litters, and individual registrations of all greyhounds whelped in or imported into North America and the Canal Zone." (NGA Const. Art. I, § 3). Gary Guccione has been its secretary-treasurer since 1982 and its executive director since 1994. He is also an employee of NGA and keeper of the stud books. By reason of his responsibility and experience, Guccione is familiar with NGA's rules, procedures, practices and policies on the registration of greyhounds. Guccione estimates that the NGA annually processes approximately 75,000 registrations, including transfers. By its registry, the NGA strives first to maintain the integrity of the breed through the identification of dogs and the establishment of breeding lines and second to provide a proper trail of record ownership. The NGA does not require that the record ownership coincide with legal ownership, but it obviously strives to attain this coincidence.

According to the plaintiff John Harnett, in April or May of 1987 he first agreed to sell eleven greyhounds to Bob Parris, but their agreement subsequently changed to a leasing arrangement. Harnett entrusted Parris with transferring these dogs' registrations from the Irish Coursing Club to the NGA. Harnett gave Parris all the documents necessary to effect the transfer of the dogs based upon their leasing arrangement. The documents also would suffice to effect a transfer based upon the sale of the greyhounds.

Harnett joined the NGA in 1986 and understood its registration process. Harnett presented himself to the NGA as an experi-

---

**1.** "All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D.Kan. Rule 56.1. The enforcement of this rule does not depend on the movant filing an

objection or showing prejudice from the opposing party's non-compliance.

**2.** The court, however, read both memoranda and concludes that nothing presented therein would change its present ruling.

enced, knowledgeable and authoritative greyhound breeder and raiser. Prior to May of 1987, more than twenty of Harnett's dogs had been transferred from the Irish Coursing Club registry to the NGA registry. Harnett had relied on others to handle the paperwork on these transfers.

In May or June of 1987, the NGA received on the eleven leased greyhounds their Irish export pedigrees, original Irish identification cards, and Irish Coursing Club transfer documents. It appeared to the NGA that the parties intended to change registry and record ownership in a single transaction. The NGA informed Carol Babb, the person submitting the transfers and the daughter of Bob and Carol Parris, that it was a two-step process. The NGA requires the export pedigrees and identity card to transfer the dogs' registration from the Irish Coursing Club to the NGA registry. The NGA then requires NGA transfer documents and the forfeiture of the original certificate of ownership to make a change in record ownership. In a case like here where the greyhounds are registered with the Irish Coursing Club, the original Irish Coursing Club papers must be forfeited. The Club papers were submitted with the original packet of materials. The plaintiff admits he wrote his name and address as the late owner on these papers, but a portion of the papers showing the actual transfer of ownership was not executed. On June 9, 1987, Carol Babb submitted the additional NGA transfer documents, and the NGA completed the registration showing a change in the eleven greyhounds' record ownership from Harnett to Carol Babb.

In May of 1988, Harnett telephoned Guccione concerning problems he was having with the Parrises. Guccione following NGA's procedure asked Harnett to put this concern in writing. The NGA next heard from Harnett through a letter dated June 6, 1988, which stated in relevant part:

From the enclosed you will gather that I have run into a problem which I would like straightened out as soon as possible.... In April/May 1987 Mr. Bob Parris was in the process of purchasing 11 greyhounds.... from me. The deal fell through and I agreed to (sic) Mr. Parris

... race the greyhounds for me (Shamrock Greyhounds)....

I gave Mr. Parris the import papers for the greyhounds and authorized him to mark them up American style and to transfer them to Shamrock Greyhounds and have the cost of doing so debited to my account with N.G.A.

Mr. Parris, I later gathered transferred the entire 11 animals to his daughters' name, Mrs. Carol Ann Baab, without my consent. Mr. Parris informed me on several occasions that he would have his daughter transfer them back. This she did in the case of two, Convent Lassie and Singing Flame.

. . . .

I am in the process of suing the Parris organization for damages resulting from this.

... Would be most grateful if you would check out. Also that the fees that were paid to transfer the 11 greyhounds was (sic) taken from my account.

That the N.G.A. request Mrs. Carol Ann Baab to transfer the remaining 9 of the original 11 greyhounds back to the ownership which they were originally intended for, Shamrock Greyhounds. Also requested that should any attempt to transfer the greyhounds by Mrs. Baab to any other than Shamrock Greyhounds be instantly stopped....

(Dk. 50, Ex. A).

By letter dated June 13, 1988, Guccione responded in pertinent part:

NGA, of course, has no legal authority to adjudicate this dispute. Either personal settlement or going through proper legal channels (as you'd stated you were pursuing) would be the appropriate options.

. . . .

We would have direct concern with respect to the transfers of the 11 greyhounds in question. Am enclosing copies of the transfer applications for your review as th [sic] the signatures. Please advise.

. . . .

Again, NGA hasn't the authority to request or direct Ms. Babb to transfer the remaining 9 greyhounds back to your own-

ership. Transfers can only be effected by either 1) submitting the properly completed transfer application (complete with Ms. Babb's signature), fee and current yellow certificate; or 2) by order of a court of competent jurisdiction. If a suit is pursued, NGA should be named as party to the suit, so the court may direct us to register the greyhounds accordingly.

(Dk. 50, Ex. B). By letter dated June 27, 1988, Harnett again wrote Guccione to complain about breeding misrepresentations made and problems caused by the Parrises, as well as to revisit the registration issue:

> In response to your letter and our subsequent telephone conversation of this morning, it is with regret that I must inform you that the 11 greyhounds transferred to Carol Ann Babb on June 1st, 1977, were not done by my hand, meaning that my signature was forged. The matter, amongst others, are in the hands of my attorneys, and I am enclosing a copy of letter from Coble, Barkin, etc. etc., for your purusal [sic].

(Dk. 50, Ex. C). Based upon Harnett's letter, it appeared that he was pursuing legal action consistent with Guccione's recommendation in his letter of June 13, 1988.

Following its established procedure for complaints or questions about transfers, NGA contacted the accused, the Parrises and Carol Ann Babb, and solicited their response to Harnett's accusation. The Parrises and Babb responded by letter disputing Harnett's version of the facts. By letter dated July 18, 1988, Guccione forwarded these responses to Harnett and pointed out that the dispute appeared to be at an impasse and "that because forgery is a crime, NGA is without legal authority or ability to determine whether the applications were in fact forged and that this was a matter that could only be determined by a court of competent jurisdiction." (Dk. 51, Guccione Aff. ¶ 17).

Harnett wrote Guccione on September 1, 1988, requesting "that the N.G.A. hold an immediate enquiry [sic] into the forging of my signature to the transfer papers of the eleven greyhounds previously mentioned." (Dk. 51 Ex. E). In January of 1989, Harnett began circulating form letters among NGA members soliciting them to put pressure on the NGA to conduct a hearing on his issues. Harnett also sent Guccione a letter dated January 3, 1989, demanding:

> The following is a demand request for a hearing regarding the alleged forgeries involving the 11 greyhounds transferred from Shamrock Greyhounds my greyhound kennel, to Carol Ann Babb.
>
> . . . .
>
> ... Although I have a civil action underway concerning the above matter, I request a hearing in April of this year before the full Executive Committee. I expect you to notify Carol Ann Babb, Carol J. Parris and Bob Parris, and anyone else you feel to be a party to this matter. My civil action could be quite lengthy and my attorney feels I am entitled to a hearing regarding the alleged forgery by the registry presiding over the registrations.

(Dk. 51 Ex. F). Guccione wrote back on January 10, 1989, that a hearing would not be scheduled for the reasons given previously. In the letter, Guccione reiterated:

> Further, the dispute has been properly placed before the courts, and appropriately, NGA has been named as party to that suit. In that regard, we of course will abide by the decision of the court.
>
> This position is consistent with NGA's position in the past with respect to such disputes—that is, if a state crime is the accusation, then the courts have jurisdiction; and if suits are filed we can only act upon the decision of the court. To do otherwise would supersede the court's authority. That NGA cannot and will not make a determination that is a province of the court. The court has jurisdiction of this matter—not NGA.
>
> A couple of suggestions: Due to the age factor of greyhounds, hence their quick depreciation, you might ask the court to take that fact into consideration and request an injunction. Another possibility: to request the greyhounds be placed in a receivership, so they can be used for

breeding or racing, until final determination is made.

(Dk. 51 Ex. G).

NGA received from its attorney a letter opinion dated February 2, 1989, concerning Harnett's request for a hearing. The counsel for NGA opined:

There is absolutely no basis for the National Greyhound Association Executive Committee to conduct any hearing in this matter. Simply the matter is before a court which has assumed jurisdiction of the parties and of the subject matter. If the NGA were now to grant a hearing concerning ownership of the greyhounds and whether or not a forgery did indeed exist would be in essence to usurp the power and jurisdiction of a properly constituted court. This we, of course, cannot do. I would, quite frankly, be fearful that any attempt on our part to hold a hearing concerning the same subject matter that is presently before the court could conceivably be a matter of contempt of the said court. We, of course, cannot and should not ever attempt to resolve any issues or disputes which are court matters.

. . . .

In the past as you well know, it has been our policy to refer disputes between members to the courts. Whenever disputes as to ownership of dogs is concerned, this is a proper matter for the courts. As I read the constitution and by-laws of the National Greyhound Association, the mission of the registry is to maintain a list of registrations of the greyhound dogs. The NGA does not make any representations as to ownership of the dogs; the National Greyhound Association makes representations only as to the registration of the dogs. Therefore, when a dispute arises as to ownership, the National Greyhound Association has no jurisdiction to determine that dispute, it is one that is properly before the courts.

(Dk. 51 Ex. H).

Guccione also served as editor for the NGA's newsletter. Prior to 1987 and continuing into 1989, Harnett wrote a column for the NGA's newsletter on greyhound racing in Ireland. Harnett's column had not generated much interest, and Harnett received only a small honorarium for writing it. After consulting with other NGA officials, Guccione determined that the NGA would discontinue publishing Harnett's column in the newsletter. Guccione sent Harnett a letter dated February 20, 1989, informing him that his column in the March newsletter would be his last published one. The NGA decided to discontinue Harnett's column because of his attacks on the NGA and threats to sue it. The NGA did not publicly release any reasons for ending Harnett's column. The NGA did not receive any letter of protest or other complaints about discontinuing Harnett's column.

Also in February of 1989, the NGA attempted to set up a non-binding mediation session between Harnett and the Parrises conducted by Dick Andrews and NGA's president, Ed Souza. The day before the mediation was to occur, Harnett backed out of the mediation complaining that he wanted a full, binding hearing.

In the later part of 1988 or the early part of 1989, Martin Lee, a business associate and social friend of Harnett, called Guccione on Harnett's behalf and inquired why the NGA would not conduct a hearing for Harnett. Harnett listened in on the telephone conversation. Lee told Guccione that Harnett said he did not sign the documents, and Guccione responded, "Well, he probably doesn't remember, he probably was drunk when he signed them." (Lee Dep. at 15). Lee later told Andrews of Guccione's statement about Harnett's possible drunkenness.

## TORT OF OUTRAGE

▆▆▆▆ Kansas recognizes the tort of intentional infliction of emotional distress or outrage. *Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1205 (1986), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). Liability under this tort arises when a person engages in extreme and outrageous conduct and thereby intentionally or recklessly causes severe emotional distress to the plaintiff. *Id.* To recover on such a claim, the plaintiff must prove:

(1) The conduct of the defendant must be intentional; (2) the conduct must be ex-

treme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe.

*Id.* (citing *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, Syl. ¶ 3, 662 P.2d 1214 (1983)). Conduct is not extreme and outrageous unless regarded as exceeding the bounds of decency or as utterly intolerable in a civilized society. *Wiehe v. Kukal,* 225 Kan. 478, 482, 592 P.2d 860 (1979). "The classic test is that liability may be found to exist when the recitation of the facts to an average citizen would arouse resentment against the actor and lead that citizen to spontaneously exclaim, 'Outrageous!.' " *Fusaro v. First Family Mtg. Corp.,* 257 Kan. 794, 805, 897 P.2d 123 (1995) (citation omitted). Before a plaintiff can prevail at trial, he must clear two threshold determinations reserved to the court: namely, that "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and ... [that] the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts v. Saylor* 230 Kan. 289, 292–93, 637 P.2d 1175 (1981).

In the pretrial order, the plaintiff puts his outrage claim in these terms:

In 1988 and 1989, after learning of the improper 1987 transfers, NGA embarked on a course designed to avoid responsibility for its 1987 negligence. Specifically, NGA told a third person (or persons) that the signatures at issue were indeed those of Plaintiff and that he had executed them while drunk—even though NGA internally admitted that there was ample reason to question the signatures. Moreover, NGA refused to grant Plaintiff a hearing in which NGA's negligence would be an issue, and NGA retaliated against Plaintiff by canceling his monthly column when he sought relief in the courts, even though NGA indicated to Plaintiff that the courts were the only proper forum for adjudicating his claims. These actions were intentional, willful, malicious, in derogation of public policy, and they caused Plaintiff to suffer severe and extreme emotional distress. NGA thus committed the tort of outrage.

(Dk. 60 at 3). The court understands the plaintiff to allege that NGA acted extremely and outrageously in suggesting that Harnett may have signed the documents while drunk, in refusing him a hearing before the executive committee on his allegations of ownership and forgery, and in canceling his monthly column.

The court is quite sure that no reasonable person learning of what the defendant is alleged to have done here would be so offended as to exclaim spontaneously, "Outrageous!" *See Taiwo v. Vu,* 249 Kan. 585, 592–93, 822 P.2d 1024 (1991). The plaintiff has no evidence that Guccione intended to hurt Harnett or his reputation by commenting that Harnett may have been drunk when he signed certain documents. The plaintiff offers no evidence that Guccione made the remark to anyone other than Harnett's personal friend and business associate, Martin Lee. Andrews knew of Guccione's comment only because Lee told him. While the remark was definitely inconsiderate and unkind, the defendant's remark was really nothing more than an unflattering opinion on what might have occurred that was made only to Harnett's close friend and business associate. "[L]iability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind." *Roberts,* 230 Kan. at 293, 637 P.2d 1175. Indeed, Harnett's response to hearing Guccione's remark was to laugh.

The actions of refusing a hearing and canceling a newsletter column are more akin to the kind of "ordinary business decisions" and dealings that are "made every day ... across the nation" than to anything that a civilized society would call atrocious, indecent and utterly intolerable. *Anspach v. Tomkins Industries, Inc.,* 817 F.Supp. 1499, 1508 (D.Kan.1993), *aff'd,* 51 F.3d 285, 1995 WL 133385 (10th Cir.1995) (Table). The most

that can be said about these decisions is that they may have been erroneous. They were made, however, after consultation with executive officials and legal counsel. There is no evidence that the NGA intended to injure Harnett by these decisions or that it knew Harnett would be likely to suffer emotionally from these decisions. Throughout the relevant period, the NGA consistently maintained the position of its limited role in Harnett's dispute with the Parrises. The NGA offered Harnett some advise on mitigating his loss as a result of this dispute, and it went so far as to set up mediation which Harnett abandoned. As for the cancellation of the newsletter column, this is not extreme but what most would expect when parties become adversaries in litigation.

Even assuming that all of these alleged actions are considered together as part of some so-called "cover up" for the defendant's mistake in registering the forged documents, they still do not amount to extreme and outrageous conduct. This motive, in itself, does not push any of the alleged conduct into that category. Acting so as to avoid legal liability or costly litigation is plainly distinguishable from acting so as to cause emotional distress on another. *See Mai v. Williams Industries, Inc.,* 899 F.Supp. 536, 542 (D.Kan.1995); *Neufeldt v. L.R. Foy Constr. Co.,* 236 Kan. 664, 668–69, 693 P.2d 1194 (1985). The defendant is entitled to summary judgment on the plaintiff's tort of outrage claim.

3. "[P]unitive damages will only be allowed in contract actions when (1) there is some independent tort amounting to [malice], fraud or wanton conduct, and (2) the independent tort results in additional injury." *Kansas Mun. Gas Agency v. Vesta Energy Co., Inc.,* 840 F.Supp. 814, 821 (D.Kan.1993) (citing *Guarantee Abstract & Title Co., Inc. v. Interstate Fire & Cas. Co. Inc.,* 232 Kan. 76, 78, 652 P.2d 665 (1982)); *see Farrell v. General Motors Corp.,* 249 Kan. 231, 247, 815 P.2d 538 (1991). In opposing summary judgment, the plaintiff refers to the independent torts of "defamation, misrepresentation, and breach of public policy," but he does not brief the elements to these torts or show that the alleged conduct meets the required elements. (Dk. 56 at 18). The only tortious activity that is alleged in the pretrial order is the same three acts constituting his tort of outrage claim.

4. "Clear and convincing" refers to the quality of proof, not the quantum. *Newell v. Krause,* 239

## PUNITIVE DAMAGES

In the pretrial order, the plaintiff's only allegations of conduct on which punitive damages would be recoverable come under his tort of outrage claim. The plaintiff opposes summary judgment arguing that "a jury could reasonably infer willfulness, wantonness or malice from NGA's plainly retaliatory and arguably slanderous post-notification conduct." (Dk. 56 at 18). Consequently, the court must decide whether the evidence, construed most favorably for the plaintiff, is sufficient for a reasonable jury to find that the defendant acted willfully, maliciously, or wantonly in suggesting that Harnett may have signed the documents while drunk, in refusing him a hearing before the executive committee on his allegations of ownership and forgery, and in canceling his monthly column.[3]

Punitive damages are available "only if the defendant has acted in a 'sufficiently egregious' manner." *Clark v. Associates Commercial Corp.,* 870 F.Supp. 1011, 1014 (D.Kan.1994). "Actions more reprehensible than mere negligence or mistake are required." *Iola State Bank v. Bolan,* 235 Kan. 175, 192, 679 P.2d 720 (1984) (citation omitted). Section 60–3702(c) of the Kansas statutes provides that "[i]n any civil action where claims for exemplary or punitive damages are included, the plaintiff shall have the burden of proving, by clear and convincing evidence [4] in the initial phase of the trial, that

Kan. 550, 557, 722 P.2d 530 (1986). For the evidence to be clear and convincing,

> the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979) (citations omitted). The evidence is clear "if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." *Ortega v. IBP, Inc.,* 255 Kan. 513, 528, 874 P.2d 1188 (1994) (citing *Chandler v. Central Oil Corp.,* 253 Kan. 50, 58, 853 P.2d 649 (1993)).

the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." This statute is substantive law, and therefore applicable in diversity cases. *Whittenburg v. L.J. Holding Co.*, 830 F.Supp. 557, 565 n. 9 (D.Kan.1993).

▮▮▮ "An act performed with a designed purpose or intent or the part of a person to do wrong or to cause an injury to another is a willful act." *Folks v. Kansas Power and Light Co.*, 243 Kan. 57, 74, 755 P.2d 1319 (1988) (quoting PIK Civ.2d 3.03). The Kansas Supreme Court defines a wanton act in these terms:

> A "wanton act" is defined as something more than ordinary negligence but less than a willful act. It must indicate a realization of the imminence of danger and a reckless disregard and indifference to the consequences. Wantonness is said to be the mental attitude of the wrongdoer rather than a particular act of negligence.

*Cerretti v. Flint Hills Rural Electric Co–op Ass'n*, 251 Kan. 347, Syl. ¶ 8, 837 P.2d 330 (1992). "[A]cts of omission as well as acts of commission can be wanton since reckless disregard and indifference are characterized by failure to act when action is called for to prevent injury." *Id.* at 368–69, 837 P.2d 330 (citation omitted). A negligent act is not wanton, unless the defendant realized the imminence of injury from its acts or omissions and then because of indifference or disregard refrained from acting so as to prevent injury. *H. Wayne Palmer & Assoc. v. Heldor Industries*, 839 F.Supp. 770, 778 (D.Kan.1993). Maliciousness is the " 'intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse.' " *Miller v. Cudahy Co.*, 592 F.Supp. 976, 1006 (D.Kan.1984) (quoting *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 524, 106 P.2d 652 (1940)); *see also Sweaney v. United Loan & Finance Co.*, 205 Kan. 66, 74, 468 P.2d 124 (1970).

Much of what the court said in analyzing the plaintiff's tort of outrage claim applies here with equal force. The court will not repeat those points, other than to highlight the more important ones.

▮▮▮ There is no evidence that the NGA by its acts or omissions intended to cause Harnett any physical, emotional or economic problems. The context in which Guccione made the remark about Harnett's drinking does not suggest an intent to harm Harnett's reputation or a realization of the imminent harm to Harnett's reputation. In refusing Harnett a hearing, the NGA relied on the advice of counsel and its understanding that the issues of ownership and forgery were within the courts' primary jurisdiction. "Punitive damages are not allowed where a party acts under an innocent mistake of law or in good faith reliance on the advice of counsel." *Bearden v. John Hancock Mut. Life Ins. Co.*, 708 F.Supp. 1196, 1197 (D.Kan. 1987) (citing *Iola State Bank v. Bolan*, 235 Kan. at 192, 679 P.2d 720). The plaintiff offers no substantial factual basis for discounting the defendant's reliance on its counsel's advice or its understanding of its limited role in disputes over the legal ownership of registered greyhounds.[5]

It strains logic to infer a retaliatory motive or vindictiveness behind the defendant's actions. There is no evidence that the NGA knew anything more about Harnett than he was an experienced, knowledgeable and authoritative greyhound breeder and raiser. As for inferring malice from the cancellation of the newsletter column, the act of cancelling is not wrongful in itself, for the defendant argues no legal right to continued publication of the column. Nor does the plaintiff assert any legal basis for treating the cancellation as contrary to public policy. Instead of covering up any possible forgeries, the NGA produced the transfer documents and asked him to check for forgery even before

---

**5.** The plaintiff points to no express provision in NGA's constitution or bylaws giving him a right to a hearing before the executive committee on a dispute over the legal ownership of registered greyhounds. This is not to say that the plaintiff has no basis for arguing such a right exists. Rather, the court is simply holding that the plaintiff has not shown that the NGA's reliance on its counsel's advice was not in good faith because of certain terms in its Constitution and bylaws. Furthermore, the court finds no admissible evidence that the NGA knew the plaintiff had such a right or that the NGA had recently recognized such a right in circumstances substantially similar to the plaintiff's allegations.

the plaintiff requested to see them. The NGA encouraged the plaintiff to name it as a party in any litigation over the ownership of the greyhounds and forgery of the different documents, so that the court could order the NGA to correct any of the registrations and records. Once it received the plaintiff's complaint about the transfer documents, the NGA followed its standard procedures and consistently took the position of no jurisdiction over the ownership dispute. Finally, the NGA did not ignore the plaintiff's requests but suggested he resort to litigation, offered advice on minimizing any harm, and even arranged for mediation of the dispute. The evidence of record, construed most favorably for the plaintiff, is insufficient for a reasonable jury to find that the defendant acted willfully, maliciously, and wantonly in suggesting that Harnett may have signed the documents while drunk, in refusing him a hearing before the executive committee on his allegations of ownership and forgery, and in canceling his monthly column. The defendant is entitled to summary judgment on the plaintiff's punitive damages claim.

IT IS THEREFORE ORDERED that the defendant National Greyhound Association's motion for partial summary judgment (Dk. 48) is granted.