No. 65,398

JOSEPH L. FARRELL and CARLA E. FARRELL, *Appellees*, v. GENERAL MOTORS CORPORATION and DON HATTAN CHEVROLET, INC., *Appellants*.

(815 P.2d 538)

Opinion
filed July 15, 1991.

*Thomas M. Warner, Jr.*, of Pullman, Hepperly & Warner, Chartered, of Wichita, argued the cause and was on the brief for appellees.

*Larry A. Withers*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Alan R. Pfaff*, of the same firm, was with him on the briefs for appellants; *David M. Heilbron*, of McCutchen, Doyle, Brown & Enerson, of San Francisco, California, argued the cause, and *Leslie G. Landau*, of the same firm, was with him on the briefs for appellants.

The opinion of the court was delivered by

ABBOTT, J.: General Motors Corporation (GM) and Don Hattan Chevrolet, Inc., (Hattan) appeal from judgments against them and in favor of Joseph and Carla Farrell (Farrells).

The Farrells purchased a 1986 Chevrolet Astro Van from a friend. The friend had purchased the van new (but not from Hattan) and had also purchased the General Motors Protection Plan (GMPP) service contract. The Farrells purchased the GMPP from their friend for $700 and paid GM the $25 transfer fee. Although we will refer to GM and GMPP throughout the opinion because different duties and contract provisions apply, it should be kept in mind that the GMPP is a contract with GM so that GM is the defendant and the one who pays any judgment based on a breach of contract or statutory violation whether we speak of GM or GMPP.

On October 23, 1988, while the Farrells were driving the van, one of their daughters bumped the power door lock switch. The locks began locking and unlocking, but stopped when Joseph Farrell jiggled the switch. Two days later, when Carla Farrell left the house in the morning, she discovered that a fire had

damaged the van's interior during the previous night. The front panel of the passenger door and the seat on the passenger's side were burned, and the molding along the door and the console had melted. The passenger side door lock switch was on the floor. Hattan ultimately repaired the damage for $3,827.

The Farrells had the van towed to Hattan. As noted earlier, the van had not been originally purchased from Hattan. On October 26, the Farrells went to Hattan to discuss the fire. They spoke with the assistant service manager, Pat Patterson. They told Patterson they were suspicious that the door locks were responsible for the fire. The Farrells asked whether the GMPP would cover the loss and asked whether they would be provided with a replacement vehicle, pursuant to the GMPP contract. The GMPP provided for $30 a day, not to exceed a total of $150 per repair, for a replacement vehicle.

Patterson told the Farrells that the Farrells' own insurance adjuster would first have to look at the van. He told them that they would also have to determine the cause of the fire to determine if the GMPP would cover the loss. Patterson said he would call the GM branch office in Kansas City to find out if the GMPP covered the loss. Patterson testified he called the office that administers the GMPP and confirmed that the Farrells' van had GMPP coverage. He testified: "I told them that we had a fire and they told me that they do not cover fire damages or consequential damages of fire, and even if it had been a covered part, only that part that was covered would be covered by the GMPP."

The GMPP provided, in part: "We will not pay anything under this Agreement: . . . [f]or a Failure caused by collision, fire, theft, freezing, vandalism, riot or explosion."

The next day Joseph Farrell stopped to talk with Patterson. Patterson said that the Farrells' insurance adjuster had inspected the van and authorized repairs and payment. The Farrells were insured with Farmers Insurance Group. The Farrells had full coverage and Farmers Insurance Group would have paid to have the Farrells' van repaired. Patterson told Joseph Farrell that "[t]hey didn't determine the cause of the fire and GM wasn't interested in investigating it." Patterson said it was a problem

for the Farrells' own insurance. The Farrells testified they were concerned about the cause of the fire for safety reasons.

The Farrells had elected not to have replacement vehicle coverage loss, without a deductible, so if Farmers had paid the loss, it would not have furnished a replacement vehicle.

The 1986 Warranty and Owner's Assistance manual that came with the van has a page entitled "Owner Assistance" that outlines a "3-Step Satisfaction Procedure." The first step is to discuss the problem with a member of the dealership management. The second step is to "contact the Chevrolet Zone Office closest to you."

The Farrells called the GM Zone Office and were referred to an 800 number in Michigan. The Farrells called the number and advised GM of the problem and asked whether there would be coverage under the GMPP.

GM told the Farrells that nothing could be done about a rental car or anything else until the fire was investigated. The Farrells were told that someone from the zone office would investigate the fire and that the Farrells should contact the dealership and tell them not to start repairs.

When the Farrells told Patterson what they had done, Patterson got angry and told them that if they did not want him to do the repairs to take the van off the lot. The Farrells called Jim Hattan, owner of Hattan, and related Patterson's comments to him. Hattan told the Farrells to deal with Jack Tanner, the service manager, in the future.

On October 31, Hattan called Carla Farrell and advised her that no one from the zone office was going to come to investigate the fire, but, instead, the damaged parts would be shipped to Kansas City, along with photos of the damage. Hattan said GM had denied coverage, so a replacement vehicle would not be available, but that he would rent them a car for $15 a day. The same day, the Farrells advised their insurance company, Farmers Insurance Group, that they did not want it involved since they felt it was an electrical fire that should be covered by the GMPP.

On November 6, the Farrells took the third step of the three-step satisfaction procedure—they drafted letters to GM, Hattan, and the Better Business Bureau, requesting arbitration. They sent these, along with the arbitration request form found in the owner's manual. On November 21, the Farrells received a letter from

GM thanking them for writing and referring them back to the GM office in Kansas City. No mention was ever made by GM of arbitration. No one ever advised the Farrells of the results of any fire investigation.

Next, the Farrells received a call from Tanner asking them to meet that evening. Tanner presented the Farrells with a release and told them that if they signed it, GM would pay the cost of the repairs. The release released GM, Chevrolet, and its dealers "from any and all claims and .causes of action for any injuries, losses and damages to my person and/or property which may have been caused by, or at which any time arise out of, or in connection with the incident involving my 1986 Chevrolet Astro Van and its power door locks." It also listed the mileage of the van as of the date of the fire. Tanner stated that GM was not admitting that it was the door locks that caused the fire.

The Farrells asked whether a free replacement vehicle would be provided. Tanner told them he would check. The next day, Tanner called the Farrells and told them that a rental vehicle would be provided. Tanner told the Farrells that the offer by GM to repair the van and provide a rental car was a goodwill gesture and was not being handled as a claim under the GMPP. No limit was placed on the length of time a replacement vehicle would be furnished to the Farrells.

The Farrells refused to sign the release. At trial, they testified that the reason they refused to sign was that they wanted to know the cause of the fire, and, on appeal, contend they also had concerns about the scope of the release.

The next contact the Farrells had with Tanner was on November 28 when he called to tell them that they had to sign the release no later than December 2 or GM was not going to accept responsibility for the repairs. Shortly thereafter, the Farrells gave their insurance company permission to close its files on the matter.

On January 6, 1989, the Farrells received a letter from Tanner advising them that the repairs to the van were completed and directing them to bring in a money order for $3,827. The letter said that there would be a $5 a day storage charge assessed from January 3 until the van was picked up.

There is conflict in the record over whether the Farrells authorized repairs. Hattan testified that on October 31, when the Farrells spoke with him on the phone, the Farrells authorized repairs. Patterson testified that the Farrells' insurance company authorized repairs. The Farrells denied they ever authorized repairs. The repair order shows the Farrells authorized repairs. This issue was not raised in the pleadings or in the pretrial order and is presented by the Farrells on appeal largely to support their argument that Hattan was not entitled to a mechanic's lien.

The van was returned to the Farrells in July 1989, after this suit was filed, pursuant to an agreement between the attorneys. At trial, some other relevant information was presented. Tanner had written a letter dated January 18, 1989, to a GMPP representative in Detroit, stating that he believed the cause of the fire was an electrical failure caused by a malfunctioning power door lock. Coverage was denied under the GMPP "because GMPP did not get involved in fire damage claims."

Hattan testified that "from day one this looked like some sort of electrical failure in the van."

It also became apparent at trial that GM had been having similar trouble with these vans. Hattan had repaired a 1986 Chevrolet Astro Van for a fire in its right front passenger door three to four months prior to the fire in the Farrells' van. GM disclosed that it had investigated at least 11 similar fires.

At trial, the Farrells made the following allegations upon which they recovered:

1. Breach of contract: The fire was caused by an electrical failure and was covered by the GMPP;
2. GM breached an implied warranty of merchantability;
3. Hattan and GM converted the van (by refusing to return it after repairs were made);
4. GM committed an unconscionable and deceptive practice under the Kansas Consumer Protection Act (KCPA, K.S.A. 50-623 *et seq.*)
   a. by selling a GMPP that limited implied warranties;
   b. by seeking a release that waived implied warranties; (This allegation was made against Hattan also.)

c. by failing to disclose that the fire was caused by an electrical failure. (This allegation was made against Hattan also.)

The jury found that the fire was caused by an electrical failure; that the electrical failure breached GM's implied warranty of merchantability and fitness for a particular purpose with damages of $3,000 for loss of value and $2,500 for loss of use; that GM engaged in deceptive acts and practices toward plaintiffs with damages of $1; that Hattan engaged in deceptive practices against plaintiffs with damages of $1,000; and that plaintiffs are entitled to recover against Hattan for wrongful deprivation and loss of use of the van, with damages of $7,000. The jury also found that Hattan acted in a malicious or willful and wanton manner (in converting the van) and awarded punitive damages.

The trial court added that, because of the finding that the fire was electrical, it found that GM breached the GMPP and entered damages for the cost of repairs in the amount of $3,872.17 and towing costs of $35. (GM, pursuant to an agreement, had paid this sum to Hattan and was given credit for this amount, and it is not in dispute on appeal.) The trial court also awarded attorney fees pursuant to the KCPA in the amount of $22,612.50. It also found that GM had committed two unconscionable acts under the KCPA and awarded $2,000 per violation. The trial court found that Hattan had committed one unconscionable act under the KCPA and awarded a civil penalty of $2,000. The trial court assessed costs against the defendants in the amount of $1,803.40. Finally, the trial court granted punitive damages against Hattan in the amount of $60,000. The total judgment was for $103,951.90.

GM does not appeal from the trial court's judgment on the verdict awarding repair costs and rental car payments under the GMPP and warranty claims. GM and Hattan do appeal the judgment as to the KCPA claims, the conversion claim, and a ruling the trial court made with respect to mitigation of damages.

The appellants' brief opens with the statement, "This case got way off track." We agree.

We, as was the trial court, are faced with a case where the Farrells were offered more than the GMPP entitled them to and which they refused to accept because they wanted GM to tell them exactly what had caused the fire. They wanted the GMPP

to pay the repair costs and not GM (GM and GMPP are one and the same; thus, the Farrells' argument is similar to insisting an individual pay what is owed from his left pocket and not his right pocket.). They also would not accept the offer because a release had to be signed and they contend the release requirement was unconscionable and overreaching. Had they signed the release, the vehicle would have been repaired and a replacement vehicle furnished.

I. Limitation of Warranties in the GMPP.

Unconscionability under the KCPA is a question of law for the trial court. See K.S.A. 50-627(b); *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 521-22, 664 P.2d 813 (1983). This court's review of conclusions of law is unlimited. *U.S.D. No. 352 v. NEA-Goodland*, 246 Kan. 137, 140, 785 P.2d 993 (1990).

The trial court made the following ruling concerning the GMPP:

"Defendants engaged in unconscionable acts and practices in violation of K.S.A. 50-627. The Court ruled that the General Motors Protection Plan Service Agreement contained a clause that limited damages for breach of the implied warranty of merchantability and fitness for a particular purpose and remedies provided by law for breach of those warranties. This limitation of damages clause violates K.S.A. 50-627 and Defendant General Motors Corporation is found to have engaged in unconscionable acts and practices for this violation."

The GMPP contract contains the following exclusion: "We will not pay anything under this Agreement . . . [f]or loss of time, inconvenience, lodging, food or other incidental or consequential loss or damage that may result from a FAILURE."

The GMPP is a written contract. Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. *State v. Smith*, 244 Kan. 283, 284, 767 P.2d 1302 (1989).

K.S.A. 84-2-314 provides, in part:

"(1) Unless excluded or modified (section 84-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

K.S.A. 84-2-315 provides:

"Where the seller at any time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is

relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

K.S.A. 84-2-715 provides that incidental and consequential damages are recoverable.

The Uniform Commercial Code contemplates that implied warranties may be limited. K.S.A. 84-2-316(2) provides:

"Subject to subsection (3), to exclude or modify the implied warranty of merchantability . . . the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' "

K.S.A. 50-639 provides:

"(a) Notwithstanding any other provisions of law, with respect to property which is the subject of or is intended to become the subject of a consumer transaction in this state, no supplier shall:

"(1) Exclude, modify or otherwise attempt to limit the implied warranties of merchantability and fitness for a particular purpose; or

"(2) exclude, modify or attempt to limit any remedy provided by law, including the measure of damages available, for a breach of implied warranty of merchantability and fitness for a particular purpose."

Then, K.S.A. 50-627(b)(7) provides that such a limitation is an "unconscionable act or practice."

The drafters of this act, however, made clear that the supplier may make other express promises and those additional promises may be limited. K.S.A. 50-639(f) provides: "The making of a limited express warranty is not in itself a violation of this section." Both parties argue extensively over whether the GMPP is an express warranty or not, and whether it is subject to K.S.A. 50-639(f). K.S.A. 50-639 only prohibits limitation of implied warranties. Subsection (f) merely restates the obvious—that other promises, in addition to ones implied by law, may be limited.

In connection with their argument, the Farrells cite *Corral v. Rollins Protective Services Co.*, 240 Kan. 678, 732 P.2d 1260 (1987). In *Corral*, the plaintiff had contracted to have an alarm installed in his home. The contract provided that the alarm was to remain Rollins' property, that Corral was to pay a periodic fee, that Rollins would maintain the alarm, and that Rollins would

not be liable for any consequential damages resulting from the failure of the alarm in excess of a specified amount.

This court first held that common-law implied warranties arise from transactions other than sales, *i.e.*, from sources other than UCC article 2. This court then held that under the then-existing statutory language in the KCPA, these common-law implied warranties could not be excluded. 240 Kan. at 688-90. Since then, K.S.A. 50-639(a)(1) has been amended to make it expressly clear that the only prohibition on limitation of warranties is of UCC warranties. K.S.A. 1990 Supp. 50-639(a)(1). The Farrells, however, argue that this amendment took effect after this cause of action arose and does not apply.

We do not find *Corral* to be relevant. Here, the issue is whether the GMPP excluded the UCC-implied warranties. We are not faced with common-law warranties. It does not matter whether the GMPP is an express warranty or a separate contract. The rule is the same—the GMPP may not limit the implied warranties.

Does the GMPP limit the implied warranties? In *Stair v. Gaylord*, 232 Kan. 765, 659 P.2d 178 (1983), the express warranty in question clearly provided that it was in lieu of all other warranties expressed or implied. This court said:

"The appellees rely on K.S.A. 1982 Supp. 50-639(f) which states: 'The making of a limited express warranty is not in itself a violation of this section.' This section, however, is not applicable to the present controversy. It merely recognizes that since an express warranty is not required to be made at all, a limited express warranty is proper. It does not allow a supplier to use a limited express warranty to exclude implied warranties." 232 Kan. at 776.

*Gaylord*, then, presented a situation where a supplier clearly and expressly attempted to limit implied warranties. Here, the GMPP clearly provides that "[w]e will not pay anything *under this Agreement* . . . [f]or loss of time, inconvenience, lodging, food or other incidental or consequential loss or damage that may result from a FAILURE." The GMPP simply does not intend to limit the car owners' rights under implied warranties. The GMPP must provide something in addition to implied warranties or it would be valueless, as the implied warranties already exist. It is permissible for GM to limit the consequential damages recoverable

in an agreement that provides extra benefits in addition to the implied warranties.

Both parties seem to be arguing that GM's conduct is relevant. GM did (at least initially) breach its implied warranties in addition to breaching the GMPP. If the GMPP contract was ambiguous, then the parties' conduct would be relevant in interpreting the contract. *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, Syl. ¶ 7, 602 P.2d 1299 (1979). However, because the contract is unambiguous, conduct is not relevant. Just because GM breached various warranties and contracts does not mean the GMPP disclaimed the damages recoverable under the implied warranties. There is a difference between breaching a warranty and disclaiming it. The trial court erred and its judgment for civil penalties on this issue is reversed.

## II. The Release.

The release, forwarded to Hattan by GM and presented to the Farrells by Hattan, provided:

"I, Joseph Farrell of Valley Center, Kansas, in consideration of the repairs paid by General Motors Corporation . . . hereby release and discharge General Motors . . . from any and all claims and causes of action for any injuries, losses and damages to my person and/or property which may have been caused by, or which may at any time arise out of, or in connection with, the incident involving my 1986 Chevrolet Astro Van and its power door locks."

"The mileage was 32,000 on November 13, 1988."

The trial court said of this release:

"[A]ttempting to effect a general release of all claims including Consumer Protection Act remedies and remedies under the General Motors Protection Act in exchange for what General Motors already legally owed, is an unconscionable act or practice pursuant to the Consumer Protection Act."

The KCPA addresses this, at least indirectly. K.S.A. 50-625 provides:

"(a) Except as otherwise provided in this act, a consumer may not waive or agree to forego rights or benefits under this act.

"(b) A claim, whether or not disputed, by or against a consumer may be settled for less value than the amount claimed.

"(c) A settlement in which the consumer waives or agrees to forego rights or benefits under this act is invalid if the court finds the settlement to have been unconscionable at the time it was made. The competence of the consumer, any deception or coercion practiced upon the consumer, the

nature and extent of the legal advice received by the consumer, and the value of the consideration are relevant to the issue of unconscionability."

The fact that an undisputed claim may be settled for less than its value means that a consumer must be able to agree to a release of liability. Therefore, the fact that the release waives rights is not, in and of itself, unconscionable. The real question is whether the settlement was unconscionable or not. Here, there was no settlement (because the Farrells refused to agree). GM made an offer to settle that was in excess of what the Farrells were owed on the GMPP and covered what they were owed on the implied warranties. The law does not require a party to make an exact determination of what caused a loss in order to make an offer. GM did not commit an unconscionable act in making a settlement offer under the facts of this case.

In any event, the request for the release is not an unconscionable act under the facts of this case.

As to Hattan, K.S.A. 50-627(a) provides that "[n]o supplier" shall commit unconscionable acts. K.S.A. 50-624(i) defines supplier as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or *enforces consumer transactions*, whether or not dealing directly with the consumer." (Emphasis supplied.) Hattan does meet the definition of a supplier. K.S.A. 50-624(c) then defines a consumer transaction as "a sale, lease, assignment or other disposition for value of property or services within this state . . . to a consumer or a solicitation by a supplier with respect to any of these dispositions."

However, the warranties that Hattan is accused of disclaiming do not arise from the service it is providing. Rather, the warranties arise from the original sale of the van. Hattan did not sell the van. Hattan did not sell the GMPP. Hattan is not a party to the GMPP. In this case, Hattan is acting as nothing more than an accommodating party. The body shop industry operates on the basis that releases and proofs of loss are left with the body shops by insurance carriers in nearly every vehicle repair case and signatures are obtained by the body shop before the vehicle is released to its owner. The insurance company then pays the body shop. To hold the body shop (Hattan) liable for the contents of a release would be very costly to the public and a great

inconvenience to the public because it would stop the present practice and require the consumer to inspect the vehicle, find the insurance company representative and sign the release, and contact the insurance carrier to arrange to have the vehicle released—all before the consumer could obtain the repaired vehicle.

Under the facts of this case, Hattan did not commit an unreasonable act or practice in violation of the KCPA. The trial court's judgment on this issue is reversed.

### III. Deceptive Acts and Practices.

GM and Hattan contend that the trial court erred in holding they concealed knowledge concerning the electrical failure and misrepresented to plaintiffs the cause of the fire.

Whether an act is a deceptive practice under K.S.A. 50-626 is a question of fact for the jury. *Waggener*, 233 Kan. at 522. Our standard of review, therefore, is whether there is substantial competent evidence to support the jury's findings. *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988).

The jury was instructed on deceptive practices as follows:

"The Plaintiffs, Joseph and Carla Farrell, claim that Defendants General Motors Corporation and Don Hattan Chevrolet, Inc. engaged in deceptive acts and practicers by intentionally concealing knowledge of the electrical failure and misrepresenting to Plaintiffs the cause of the failure was undetermined.

"Deceptive acts and practices include the intentional failure to state a material fact, or the intentional concealment, suppression or omission of a material fact whether or not any person has in fact been mislead [*sic*]."

K.S.A. 50-626(b)(3) provides that a deceptive act may include (but is not limited to) "the intentional failure to state a material fact, or the intentional concealment, suppression or omission of a material fact, whether or not any person has in fact been misled." The appellants did not object to the instruction and do not contend on appeal it is erroneous.

Appellants argue that it was not a fact that the fire was caused by an electrical failure, but that it was just the opinion of various service personnel. Appellants, citing *Timi v. Prescott State Bank*, 220 Kan. 377, 553 P.2d 315 (1976), state, "A fact is a fact, capable of ascertainment. An opinion is not a fact."

*Timi* does not stand for a blanket proposition that an opinion is not a fact. In *Timi*, an employee of the defendant bank, gave his honest opinion as to the financial solvency of a third party. This was held not to be fraud. *Timi* is simply not relevant to the present case.

Here, the material fact that the Farrells allege was not disclosed was that the Hattan mechanics were of the opinion that the fire was caused by electrical failure. That the fire was so caused could never be more than an opinion. There is no way to "prove" it any further. Tanner believed that the fire was electrical. So did Hattan. This was material information. "A matter is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction involved." *Griffith v. Byers Construction Co.*, 212 Kan. 65, 73, 510 P.2d 198 (1973). Knowing where the fire started prior to GM's offer would have put the Farrells in a better position.

There was no objection made that Hattan and Tanner are not qualified to give an opinion as to what caused the fire and that issue is not before us.

The penalties awarded for failure to disclose the cause of the fire are affirmed.

### IV. Mechanic's Lien.

At trial, Hattan moved for a directed verdict on the conversion claim, stating it had a mechanic's lien on the van. The trial court said orally:

"As to the issue of conversion, plaintiffs' conversion theory is unique. The Court believes the plaintiffs are entitled to present that claim to the jury, violation of the Consumer Protection Act. In attempting to force plaintiffs to execute a release and lose incidental damages otherwise recoverable under the Consumer Protection Act, cannot be defeated by reliance on K.S.A. 58-210 Statutory lien law, and I recognize that, in making that holding, the statutorily—statutory conflict between those two statutes, but I believe that's how it should be reconciled."

In the journal entry, the trial court was more succinct:

"The Court ruled as a matter of law that Defendant Don Hattan Chevrolet, Inc., could not rely upon K.S.A. 58-201 as a defense to the wrongful detention claim because the Court found that Defendant Don Hattan Chevrolet, Inc., participated in attempting to effect a general release of all plaintiffs' damage claims and said participation was an unconscionable act and practice in violation of K.S.A. 50-627."

Because we have already held that Hattan did not commit an unconscionable act concerning the release, it follows that Hattan held a valid mechanic's lien on the van, and there can be no conversion.

In any event, the trial court's ruling that a mechanic's lien is waived if the holder commits a wrongful act is in error.

K.S.A. 1990 Supp. 58-201 provides, in part:

"Whenever any person, at or with the owner's request or consent shall perform work, make repairs or improvements or replace, add or install equipment on . . . automobiles [or] trucks [or] vehicles of all kinds, . . . a first and prior lien on such personal property is hereby created in favor of such person performing such work . . . and such lien shall amount to the full amount and reasonable value of the services performed and shall include the reasonable value of all material used in the performance of such services and the reasonable value of all equipment replaced, added or installed."

Hattan argues it had a valid mechanic's lien and that a valid mechanic's lien is a complete defense to conversion. Hattan's general statement of the law is correct. Conversion is the *unauthorized* assumption of right of ownership over personal property belonging to another. *Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987). In essence, the question is: Who has the rights to possession? In *State v. Etape*, 237 Kan. 380, 383, 699 P.2d 532 (1985), this court said, "[O]ne who has a mechanic's lien on property has a superior possessory interest as against the general owner." Since the holder of a mechanic's lien has a superior possessory interest, there can be no conversion against the owner.

There is only one limit that has been recognized on mechanics' liens and that is that there must have been a request and contract with the owner for the repairs to have been done. See *Olson v. Orr*, 94 Kan. 38, 145 Pac. 900 (1915); *United States Fidelity & Guaranty Co. v. Marshall*, 4 Kan. App. 2d 9, 601 P.2d 1169 (1979).

The KCPA does not take away a valid lien and allow a conversion claim. The KCPA provides: "Nothing in this act shall in any way limit or affect the rights or remedies which are otherwise available . . . to any person under this or any other law statutory or otherwise." K.S.A. 1990 Supp. 50-646.

While this section would normally apply to a consumer seeking additional recovery (*e.g.*, punitives for fraud), the language "any person" makes it applicable to Hattan. Secondly, the KCPA provides for civil damages for wrongful acts under it. To allow a conversion claim simply because the Act was violated would be to allow double recovery (and punishment) simply for a violation of the Act. This is not to say that if the act was wrongful in another sense, *i.e.*, fraudulent, punitive damages could not be recovered for the fraud.

In its ruling on the motion for judgment notwithstanding the verdict or for a new trial, the trial court also held that Hattan abandoned its lien when it returned the vehicle to the Farrells. K.S.A. 1990 Supp. 58-201 goes on to provide that "such lien shall be valid as long as the lien claimant retains possession of the property, and the claimant of the lien may retain the same after parting with the possession of the property by filing within 90 days in the office of the register of deeds, under oath, a statement of the items." Then, K.S.A. 58-215 goes on to provide that "[t]he voluntary delivery to the owner or claimant of any personal property by any person claiming a lien thereon, as provided in this act, shall be held to be an abandonment of such lien, and such lien may be waived by special contract."

In *Weatherhead v. Boettcher*, 3 Kan. App. 2d 261, 593 P.2d 420 (1979), the plaintiff filed for replevin of a car held by a repairman. The repairman answered, arguing he held a valid mechanic's lien. Then, the repairman delivered the car to the defendant in anticipation of trial. The Court of Appeals held that the delivery of the car waived the lien absent an agreement that there was no waiver. 3 Kan. App. 2d at 263-64. Here, there is no evidence of such an agreement.

Here, Hattan had a valid lien and did not deliver the vehicle until it had been paid in full by GM under an agreement by the parties that GM would get credit against any judgment the Farrells might receive for the repair bill. Under the facts of this case, delivery of the vehicle, after the repair bill has been paid, does not amount to a waiver of the lien during the time Hattan held the vehicle, and the trial court erred in holding that Hattan was not entitled to hold the vehicle until paid and, thus, converted the van.

## V. Punitive Damages.

Breach of contract, standing alone, does not call for punitive damages even if the breach is intentional and unjustified, but such damages are allowable if there is some independent tort present. *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 513, 516, 757 P.2d 304 (1988). Having held there is no conversion, there is no tort for punitive damages to be based on.

## VI. Mitigation of Damages.

Appellants appeal the actual damage award for conversion of $7,000. The appellants are only appealing the award for loss of use in connection with conversion (for the period of January 3, 1989, to July 28, 1989) and not the award for loss of use in connection with the breach of implied warranty (for the period of October 25, 1988, through January 3, 1989, when the repairs were completed). They argue that the trial court erred in ruling that the Farrells had no duty to mitigate their damages. Here, GM offered the Farrells everything they demanded. The Farrells could have accepted GM's offer to pay for the damages and pay for a rental car or they could have had their insurance company pay for the repairs at any time (at no cost to the Farrells). Having held that there was no conversion, this issue is moot.

As a result of our holdings herein, the remaining arguments are moot. The Farrells' application for attorney fees on appeal is denied.

Affirmed in part, reversed in part, and remanded to reconsider attorney fees in light of our holding that Hattan and GM committed only one violation each of the KCPA.