No. 83,604

WILLIAM C. ALEXANDER, JOHN HALL, and CAROLYN HALL, *Plaintiffs*, v. CERTIFIED MASTER BUILDERS CORPORATION, *Defendant.*

(1 P.3d 899)

Opinion filed March 10, 2000.

*Patricia L. Lear-Johnson,* of Longan & Associates, of Leawood, argued the cause, and *S. W. Longan III,* of the same firm, was with her on the brief for plaintiff William C. Alexander.

*Robert A. Babcock,* of Baker, Sterchi, Cowden & Rice, L.L.C., of Overland Park, argued the cause, and *Kara Trouslot Stubbs,* of the same firm, was with him on the brief for plaintiffs John Hall and Carolyn Hall.

*Don R. Lolli,* of Swanson Midgley, L.L.C., of Kansas City, Missouri, argued the cause, and *Robert R. Bartunek* and *Craig Kenworthy,* of the same firm, were with him on the briefs for defendant.

The opinion of the court was delivered by

DAVIS, J.: The United States District Court for the District of Kansas certified two questions of law for this court pursuant to K.S.A. 60-3201 in connection with a case brought by William Alexander and John and Carolyn Hall against Certified Master Builder Corporation (CMB).

The facts relating to the certified questions are set forth by the United States District Court in its certification order:

"This case arises from two independent residential construction agreements—one between plaintiff William Alexander and Michael Everhart d/b/a Everhart Homes, Inc., and one between plaintiffs John and Carolyn Hall and Everhart. At the time that the agreements were entered into and during the subsequent construction of the homes, Everhart was a Certified Master Builder.

"The Certified Master Builder Corporation (CMB) is an organization created to promote the home building industry. Comprehension of CMB's role in its members' endeavors is critical to resolution of this case. When CMB incorporated in 1974, its articles of incorporation stated the purposes of the association, including:

'(1) To participate in and to provide a program whereby consumers can be better assured that new homes they are buying are produced to an acceptable standard and are backed by a Warranty insured by a Casualty Insurer.

'(2) To do all things necessary to meet and maintain the criteria of eligibility from time to time established by [CMB] for participation in such program and in furtherance of said program to apply for and receive a revocable license from [CMB] to issue a standard form Warranty to new home buying consumers.'

"Subsequent amendments to the articles in 1981 replaced the above language with the following:

'(1) To promote a home warranty program or programs among members of the home building industry, and to encourage and to give assistance in making application for membership in any such program or programs.'

'(2) To act as a representative of a home warranty program or programs and to receive, answer and otherwise respond to inquiries from home builders, home owners and prospective home buyers concerning any such program.'

"In 1992, CMB again amended the articles to add the following purpose:

'(14) To operate certified master builder and certified master remodeler programs and similar programs for other segments of the property development, home building and home remodeling industries and to take all action reasonably related thereto.'

"From its incorporation through April 1993, CMB's by-laws articulated the following corporate objectives:

'A. To benefit the public by providing a means to recognize qualified, reliable home builders . . . through [the] Certified Master Builder [Program.]

'B. To provide a process of handling consumer complaints regarding home building . . . as an alternative to litigation.

'C. To ensure that new home buyers, as a minimum, are offered a one-year limited warranty which includes a guideline of industry standards of construction.

'D. To ensure that purchasers of residential remodeling, as a minimum, are offered a reasonable warranty.  . .

'E. To operate homes tours to showcase member's homes and make it convenient for consumers to inspect and educate themselves concerning new home products.'

"The corporate rules and regulations applicable when plaintiffs contracted for construction of their homes were those adopted in June 16, 1992. The rules and regulations, in pertinent part, provide:

'I. MISSION STATEMENT

'The Certified Master Builder Program is intended to promote the home building industry and to encourage professionalism within that industry. It requires all Certified Master Builders to meet strict qualifications. The program will benefit the home buying public by providing a means to recognize qualified, reliable home builders.

'The Certified Master Builder Program provides an economical and fair process of handling consumer complaints. The conciliation and arbitration procedure offered provides an alternative to costly and time-consuming litigation.

'The Certified Master Builder Program also ensures that Certified Master Builders offer, as a minimum, a one-year limited warranty to new home buyers. The warranty provides the home buying public a guideline of industry standards of construction.

. . . .

'IV. WARRANTY

'A. All Certified Master Builders agree to issue to their customers, as a minimum, a one year limited warranty from the final inspection or occupancy of the owner, whichever occurs first.

. . . .

'V. CONTRACT PROVISIONS

'All Certified Master Builders agree to use contracts which are clear, professionally drafted, contain all legally-required provisions (specifically including provisions regarding the appropriate Conciliation and Arbitration Procedure) and fair to their customers.

. . . .

'VII. MISCELLANEOUS

. . . .

'C. The member will have available to him professionally designed promotional materials, including but not limited to decals, brochures, site signs, warranties, "Care of Home" booklets, etc.

'D. The member will be provided with an official Certified Master Builder Certificate suitable for framing and displaying in his place of business.

'E. Each member agrees to present his business firm and/or himself to the public as a Certified Master Builder by using the insignia when advertising to identify himself as such and to use any promotional materials as may be made available under the Program.'

The applicable rules and regulations also set forth a detailed conciliation and arbitration procedure and required CMB members to pay dues.

"CMB, through its members, distributed a brochure to the general public. The brochure provides a detailed description of the benefits of contracting with a Certified Master Builder. The brochure provides that, '[w]hen you select a Certified Master Builder, you can enjoy the protection of a Conciliation and Arbitration agreement. Should you have a complaint that cannot be resolved with your builder, the [CMB's] Arbitration and Conciliation Committee will investigate to determine the builder's responsibility.'

"Under the Certified Master Builder seal, the brochure explains, '[t]he Builder who displays the Certified Master Builder Seal has demonstrated the highest standards of CHARACTER TRUST AND PROFESSIONALISM.' In a section labeled 'Earning the Certification,' the brochure provides:

'To become a Certified Master Builder, an applicant must:

- have experience in the home or commercial construction profession for a specified period of time
- have built a required number of homes
- have demonstrated financial and on-site responsibilities
- be a full-time professional who derives his principal income from home building and/or related real estate activities
- submit the names of previous customers as references
- have Certified Master Builder sponsors with personal knowledge of the applicant's business integrity and construction knowledge
- have an acceptable credit history
- appear before a committee of Certified Master Builders for a personal review
- agree to take part in annual continuing education
- agree to abide by the Code of Ethics of the Certified Master Builder program
- agree to binding arbitration in the event of an unresolved complaint from a customer.'

"Once accepted as a Certified Master Builder, members are reviewed annually. The brochure also lists the address and telephone number of CMB.

"CMB also advertised its program in newspapers throughout the greater Kansas City metropolitan area which includes Wyandotte and Johnson Counties in Kansas. Plaintiffs allege that CMB, through the brochure and advertising, misrepresented the benefits of contracting with a Certified Master Builder.

"At its inception, CMB allowed then-current HBA members to gain CMB membership without meeting the qualifying requirements. Michael Everhart d/b/a Everhart Homes became a Certified Master Builder through this exemption.

Everhart contractually agreed with CMB upon membership to follow CMB's code of ethics and to offer a one-year limited warranty meeting CMB's requirements.

"CMB does not require members of the program to use a form contract. CMB does nothing to check the contract language used by CMB members, or to verify that the contracts are clear and contain the required language. Specifically, CMB did not approve Everhart's contract with Alexander or the Halls. If a CMB member did not comply with the rules and regulations, the member was subject to termination or non-renewal of membership. Members are generally reviewed for continuation of membership, with each initial review coinciding with the membership anniversary date. Everhart, however, did not receive a review for at least twenty months after becoming a member of the CMB program in July 1992.

"After receiving numerous homeowner complaints, CMB investigated Everhart and refused to renew his CMB membership. CMB's October 1994 summary of its file on Everhart stated that Everhart engaged in the following: (a) misrepresentations regarding his contract being the approved CMB form; (b) cost-plus contracts resulting in excessive prices; (c) quitting work on a home if disputes arose, even if he was at fault; (d) abuse and threats toward buyers and subcontractors; (e) overbilling for work; (f) disputes with over one-half of his buyers; (g) disputes with subcontractors and suppliers.

## "A. Facts Specific to Alexander's Claims

"In March 1993, Alexander was considering various builders. Everhart gave Alexander the CMB brochure explaining the benefits accruing to Alexander from contracting with Everhart as a Certified Master Builder. Alexander claims that he had not seen any articles or advertisements that informed him that founding members of the CMB did not 'earn the certification,' or that described the grandfathering process by which builders who were HBA members in good standing were made CMB members without requiring the background information and program compliance described in the brochure.

"On April 1, 1993, Alexander and Everhart entered into a residential construction agreement. Alexander read the contract, initialed each page, and signed at the end of the contract. The contract included a provision stating that the contract and home were 'covered by the [CMB] program,' and expressly incorporated the conciliation and arbitration procedures of CMB's program, as 'described in the limited warranty.' The contract further provided for arbitration procedures in the event that the buyer does not opt for CMB's procedures. The builder's limited warranty, which was attached to the contract, covered defects in workmanship and materials and expressly applied for one year from the date of closing. The builder's limited warranty stated nothing about the CMB procedures. Alexander did not talk to anyone at CMB prior to signing a contract with Everhart.

"As of the date that Alexander received the CMB brochure, Alexander believed, based on representations in the brochure, that Everhart had home-building experience. As of April 1, 1993, Alexander claims that he had no knowledge that Everhart demonstrated a lack of financial and on-site responsibility or that he was

not a full-time professional deriving his principal income from home-building. Alexander claims that, if CMB had told him that Everhart was grandfathered into the program, Alexander would have insisted on obtaining references and viewing homes built by Everhart. Alexander relied on the representations in the brochure that CMB verified the qualifications of its builder members, and that the builders had the experience, financial responsibility, on-site responsibility, business integrity, construction knowledge, character and professionalism to 'earn the certification.' Alexander claims that he also relied on the brochure's statements that, if he had a complaint with the builder, the arbitration and conciliation committee would investigate to determine the builder's liability, the brochures' representation that each builder complied with the Code of Ethics, the representation that he would be protected by the CMB program, and the representation that each builder demonstrated the highest standards of character, trust and professionalism.

"In January 1994, before construction of the home was complete, disputes arose between Alexander and Everhart, and Everhart demanded arbitration under the contract. Alexander understood that Everhart could demand arbitration, but he believed that the arbitration procedures referenced in the CMB brochure were available at Alexander's option. Alexander contacted CMB regarding the conciliation and arbitration procedures because the brochure provided that arbitration was available through the CMB program. Alexander called CMB to get assistance in selecting an expert for the arbitration. Diane Lair, an employee of CMB, however, told him that his home did not qualify for arbitration under the program because he had not closed on the house. Alexander never formally requested CMB's conciliation and arbitration procedure. Alexander instead selected an arbitrator pursuant to Everhart's demand.

"B. Facts Specific to Hall's Claims

"In October or December 1992, while they were selecting a builder, the Halls received the CMB brochure. The Halls had also seen several other articles and advertisements that made the same representations included in the CMB brochure. The Halls chose Everhart over another builder because Everhart was a Certified Master Builder. The Halls would not have chosen Everhart if they had not believed the representations in the CMB promotional materials. Based on the CMB brochure and other promotional materials, the Halls believed that CMB would conciliate any disputes that arose between them and their builder. Prior to signing any contract, the Halls had reviewed a September 20, 1992 article in the Kansas City Star, indicating that HBA members were grandfathered into the CMB program, but the Halls claim that they did not realize that HBA members were not required to meet the qualifications for membership into CMB's program. Moreover, the statement in the article followed a statement that ninety-percent of HBA members exceeded the program's standards. CMB also offered other articles from March and April 1993 that indicated HBA members were not required to go through the formal application process.

"On December 23, 1992, the Halls and Everhart entered into a residential construction contract. The contract contained the same terms discussed with respect to the Alexander contract. The Halls read the contract and the attached limited warranty, which covered defects in workmanship and materials by the builder, before signing the contract. The Halls did not speak with anyone at CMB prior to executing their agreement with Everhart. After signing the contract with Everhart, the Halls received a copy of the separate CMB limited warranty form providing that the arbitration and conciliation procedures did not apply until after closing.

"After disputes arose between Everhart and the Halls, the Halls requested and were refused access to the conciliation and arbitration procedures of CMB because they had not yet closed on their house or received a certificate of occupancy. The Halls then submitted their claims against Everhart to the binding arbitration pursuant to the contract.

"IT IS, THEREFORE, BY THE COURT ORDERED that the parties' motions (Docs. 190, 192, 195) to certify questions of law to the Kansas Supreme Court are granted in part and denied in part. The court certifies the following questions:

'(1) Whether the one-year limitations period under K.S.A. 60-514(c) applies to a claim for civil penalties under the Kansas Consumer Protection Act (KCPA), 50-623 *et seq.*, in a case in which the plaintiff asserts both a civil penalties claim and an actual damages claim under the KCPA?

'(2) Whether, under the facts of this case, defendant Certified Master Builder is a "supplier" under K.S.A. 50-624(i)?' "

## Discussion and Analysis

*(1) Whether the 1-year limitations period under K.S.A. 60-514(c) applies to a claim for civil penalties under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 et seq., in a case in which the plaintiff asserts both a civil penalties claim and an actual damages claim under the KCPA.*

K.S.A. 60-514(c) provides a 1-year statute of limitations for "[a]n action upon a statutory penalty or forfeiture." The KCPA creates a right of action for Kansas consumers against suppliers who violate provisions of the KCPA when dealing with consumers. The KCPA provides for recovery of damages or a civil fine, whichever amount is greater:

"A consumer who is a aggrieved by a violation of this act may recover, but not in a class action, damages or a civil penalty as provided in subsection (a) of K.S.A. 50-636 and amendments thereto, whichever is greater." K.S.A. 50-634(b).

K.S.A. 50-636(a) allows the collection of a civil penalty of not more than $5,000 for each violation of the KCPA.

In providing for recovery of damages and creating a right of action in consumers for violation of the KCPA, K.S.A. 60-512(2), which provides for a 3-year statute of limitation on "[a]n action upon a liability created by a statute *other than a penalty or forfeiture,*" also comes into play. The question in this case is which statute of limitations applies.

CMB contends that because the plaintiffs are asking for imposition of civil penalties under the KCPA, that claim should be governed by the 1-year statute of limitations found in K.S.A. 60-514(c). According to CMB, the plaintiffs' claim for civil penalties should thus be dismissed and the plaintiffs forced to proceed only on an action for actual damages. The plaintiffs, however, argue that because damages and civil penalties are alternative forms of recovery under the KCPA, they should both be subject to the 3-year statute of limitations and thus they should be able to proceed and attempt to recover either their actual damages or the civil penalties, whichever prove to be greater.

This court has not addressed the issue. The plaintiffs, however, argue that the Court of Appeals' opinion in *Haag v. Dry Basement, Inc.*, 11 Kan. App. 2d 649, 732 P.2d 392, *rev. denied* 241 Kan. 838 (1987), is on point and dispositive of the issue.

In *Haag*, the plaintiff filed suit for damages under the KCPA. One of the defendant's contentions was that because the KCPA provided for civil penalties, an action under the KCPA was an action for a statutory penalty and governed by the 1-year statute of limitations found in K.S.A. 60-514(c). The Court of Appeals disagreed, citing a case from North Carolina, *Holley v. Coggin Pontiac*, 43 N.C. App. 229, 259 S.E. 2d 1, *cert. denied* 298 N.C. 806 (1979), for the proposition that the emphasis should be on the nature of the right rather than on the remedy and that " 'to let the limitations be determined by the remedy would be to have the tail wag the dog.' " 11 Kan. App. 2d at 651 (quoting *Holley*, 43 N.C. App. at 241). The court went on to state:

"The nature of plaintiff's action was to recover upon a liability created by statute and not upon a statutory penalty. She sought to bring defendant within the scope

of the KCPA and establish its liability thereunder rather than to recover upon a statutory penalty." 11 Kan. App. 2d at 651.

The Court of Appeals in *Haag* also noted that where there is doubt as to which statute of limitations should apply, the longer statute should be used, and further stated that the 3-year statute of limitations promotes the policy of the KCPA because many deceptive practices could go undiscovered for over a year. The court held that the 3-year statute of limitations found in K.S.A. 60-512(2) should apply to actions under the KCPA.

The Court of Appeals' decision in *Haag* implies that although a plaintiff may seek to recover the greater of either actual damages or a civil penalty under the KCPA, the action is not an action "upon a statutory penalty" and thus is governed by the 3-year statute of limitations found in K.S.A. 60-512(2). Although the Court of Appeals' conclusion in *Haag* that the 3-year statute of limitations is to be applied to actions under the KCPA is clear, its authority is somewhat diminished by the fact that the plaintiff in *Haag* was seeking damages, not a civil penalty.

There is some disagreement, however, among federal district courts in Kansas with regard to the interpretation of *Haag*. In *Griffin v. Security Pacific Automotive Financial*, 25 F. Supp. 2d 1214, 1217 (D. Kan. 1998), the court held that an action for damages under the KCPA is governed by the 3-year statute of limitations found in K.S.A. 60-512(2), while an action seeking civil penalties under the KCPA is governed by the 1-year statute of limitations found in K.S.A. 60-514(c). The *Griffin* court based this conclusion on the holdings of two prior federal district court cases, *Wight v. Agristor Leasing*, 652 F. Supp. 1000, 1018 (D. Kan. 1987); and *AgriStor Leasing v. Meuli*, 634 F. Supp. 1208, 1218 (D. Kan. 1986), which reached the same conclusion, as well as its interpretation of *Haag*. 25 F. Supp. 2d at 1217. The *Griffin* court stated: "It is implicit from *Haag* that KCPA actions seeking actual damages and KCPA actions seeking civil penalties are governed by different statutes of limitations." 25 F. Supp. 2d at 1217.

Contrary to the reasoning of the *Griffin* court, *Haag* implies no such thing. Rather, the Court of Appeals in *Haag*, as noted above,

held that the focus should be on the nature of the right rather than on the remedy, and that the 3-year statute of limitations should apply. The federal cases relied upon by the *Griffin* court were decided prior to *Haag*, and, thus, their authority is questionable. Judge Saffels, the author of one of the cases relied upon by the *Griffin* court, *Wight v. Agristor Leasing*, later recognized that *Haag* had effectively eliminated the prior decisions, and that the 3-year statute of limitations in K.S.A. 60-512(2) should apply to all actions under the KCPA. See *Skeet v. Sears Roebuck & Co.*, 760 F. Supp. 872, 877 (D. Kan. 1991). Further, prior to the decision in *Griffin*, the federal district court found that the *Haag* court had rejected the holdings in *Wight* and *AgriStor*. See *United Cities Gas Co. v. Brock Exploration Co.*, 984 F. Supp. 1379, 1385, n.5 (D. Kan. 1997).

The above analysis does not necessarily mean that *Griffin* was incorrect in holding that two different statute of limitations should apply. It does, however, mean that there is no authority for this holding outside of the language of K.S.A. 60-514(c). The pertinent question is whether an action under the KCPA which asks for civil penalties is an "action upon a statutory penalty or forfeiture" under K.S.A. 60-514(c).

The resolution of this issue requires the interpretation of not only K.S.A. 60-512(2) and 60-514(c) but also the KCPA. The interpretation of a statute is a question of law, and this court's review is plenary. See *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

There is no question that K.S.A. 50-634 creates a private right of action nonexistent at common law and, thus, is "an action on a liability created by statute."

"A liability is 'created by a statute' for purposes of K.S.A. 60-512(2) where liability for resultant damages would not arise but for the statute. A statute that merely provides a procedure for obtaining relief does not trigger K.S.A. 60-512(2); it must provide a new substantive right that does not otherwise exist at common law." *Wright v. Kansas Water Office*, 255 Kan. 990, 997, 881 P.2d 567 (1994).

K.S.A. 50-634 "breaks new ground in granting substantial civil remedies to aggrieved consumers, in the hope that they will enforce the [KCPA] as 'private attorneys general.'" Clark, *The New*

*Kansas Consumer Legislation*, 42 J.K.B.A. 147, 189 (Fall 1973). In this respect, there is no question that the statute fits well into the provisions of K.S.A. 60-512(2) providing for a 3-year statute of limitations for an action based on "[a]n action upon a liability created by a statute other than a penalty or forfeiture."

At the same time, the statute creating this new right also provides for the recovery for a civil penalty of up to $5,000 as an alternative for actual damages where the penalty would be a greater amount. Thus, the clear language of the statute in providing for a civil penalty calls into question the applicable statute of limitations. K.S.A. 60-514(c) provides a 1-year statute of limitations for "[a]n action upon a statutory penalty or forfeiture." That a penalty is provided for may not be denied.

We begin our analysis by considering the KCPA and the expressed purposes for which it was enacted. The purposes of the KCPA are to: (a) simplify, clarify, and modernize the law governing consumer transactions; (b) to protect consumers from suppliers who commit deceptive and unconscionable practices; (c) to protect consumers from unbargained-for warranty disclaimers; and (d) to provide consumers with a 3-day cancellation period for door-to-door sales. K.S.A. 50-623.

The KCPA repealed the Kansas Buyer Protection Act. As noted by Clark, the KCPA provides a private remedy to consumers in the hope that they will enforce the KCPA as "private attorneys general." 42 J.K.B.A. at 189. Under the Kansas Buyer Protection Act, the exclusive right to redress wrongs was vested in the Attorney General. K.S.A. 1972 Supp. 50-601 *et. seq.* The legislature recognized the merit of encouraging consumers to pursue their rights and made provisions which allow actual damages or civil penalties, as well as costs and attorney fees for successful litigants. The KCPA attempts to eliminate the common-law doctrine of *caveat emptor* and check deceptive and unconscionable acts of suppliers in the market place.

It is the consumer who suffers from deceptive and unconscionable acts and practices by suppliers. In most cases involving deceptive and unconscionable acts, the consumer suffers monetary damage. The purpose of the KCPA is not only to stop such prac-

tices in the market place but also to provide consumers with an avenue to recover damages suffered. By allowing the consumer personal recovery together with attorney fees the overall purpose of the KCPA is advanced.

In some cases under the KCPA, however, the consumer suffers damages which may be difficult to quantify monetarily. In such circumstances, the amount of actual damages which may be proven by the consumer might well be insufficient to completely compensate the consumer for the damages suffered. To remedy this situation, the KCPA provides for a civil penalty as an alternative to actual damages. It is significant that the legislature in providing for a remedy did not provide for a penalty separate and distinct from damages. Rather the legislature allowed a consumer aggrieved under the KCPA to recover either damages or a civil penalty, whichever is greater. The KCPA does not provide for a separate civil penalty in addition to the consumer's damages. In this respect, although couched in terms of a penalty, the civil penalty provided by the KCPA is actually more remedial in nature than punitive.

CMB argues that where statutes contain both penal and remedial elements, it is proper to separate the elements and apply the appropriate statutory limitation to each. This view has some support. See *Carlson v. McCoy*, 193 Colo. 391, 566 P.2d 1073 (1977); *Brown v. Q., O. & K. C. Ry. Co.*, 198 Mo. App. 71, 199 S.W. 707 (1917); *Cummings v. Board of Education*, 190 Okl. 533, 125 P.2d 989 (1942). However, that rule seems less applicable in the case at hand. The statutes at issue in *Carlson, Brown,* and *Cummings* all provided for compensation and penalties to be sought. See *Carlson*, 193 Colo. at 393 (plaintiff tenant could recover three times rent plus attorney fees); *Brown*, 198 Mo. App. at 73 (statute provided for recovery of damages and an additional penalty); *Cummings*, 190 Okl. at 539 (plaintiff sought damages and a like sum as a penalty). Thus, they provided for basically two separate actions, one for compensation, and another for penalties. The penalty aspect in each situation was clear.

In contrast, K.S.A. 50-634(b) allows the aggrieved consumer to recover either the penalty or damages, *whichever is greater*. Thus, the statute contemplates one action, with the consumer being al-

lowed to collect either his or her actual damages as found by the court or a civil penalty, depending upon which is greater. Therefore, the civil penalty, while retaining punitive aspects, serves also to provide reimbursement for the private wrong done to the consumer, which is more akin to indemnity. See *Huntington v. Attrill*, 146 U.S. 657, 667-69, 36 L. Ed. 1123, 13 S. Ct. 224 (1892) (stating that the strict and primary distinction between a penal and remedial law is whether the wrong done is one to the public or to an individual, and that in many instances where a statute gives accumulative damages to the party grieved, it is not a penal action). To apply two different statutes of limitation would force the consumer to file within 1 year, or find his or her options for recovery reduced to merely actual damages. Such a result would frustrate the intent of the statute.

K.S.A. 60-514(c), which provides for a 1-year statute of limitation for "[a]n action upon a statutory penalty or forfeiture" does not fit the relief provided for in the KCPA. The emphasis in the KCPA is upon providing relief to consumers not primarily through a penalty or forfeiture but rather through the creation of a right of redress against deceptive or unconscionable acts of suppliers in the market place. The object of the act is remedial rather than penal. Application of a 1-year statute of limitations would be appropriate if the legislature had chosen to provide only a penalty for a violation of the KCPA or if the legislature had provided for a separate penalty in addition to a damage recovery. Instead, the legislature provided alternative recovery of damages or civil penalty, whichever is greater. Under such circumstances, application of a 1-year statute to the civil penalty provision would be contrary to the legislature's intent in creating a remedy for Kansas consumers. Consumers would be forced to file their suit within 1 year or lose the benefit of the alternative remedies for which the legislature clearly provided.

For the above reasons, we conclude that actions under K.S.A. 50-634(b) seeking damages and civil penalties are subject to the 3-year statute of limitations found in K.S.A. 60-512(2) rather than the 1-year statute of limitations found in K.S.A. 60-514(c).

*(2) Whether, under the facts of this case, the defendant Certified Master Builder is a "supplier" under K.S.A. 50-624(i).*

The second question certified to this court is whether, under the facts of the case, CMB is a supplier under K.S.A. 50-624(i) and thus subject to the KCPA. At the outset, there is some dispute over our standard of review. CMB argues that the question is a mixed one of law and fact and that this court should apply a substantial competent evidence test to the factual findings and then determine whether the findings support the court's legal conclusions. This standard is incorrect. The question certified is solely one of law. This court does not review the factual findings of the federal district court. Indeed, it could not, because the record in this case is not before us. Rather, instead, this court accepts the facts as found by the federal district court and determines whether, under the facts as presented by the federal district court, CMB is a supplier.

K.S.A. 50-624(i) defines a supplier as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." This definition includes debt collection agencies and advertising agencies. See K.S.A. 50-624(i), Kansas Comment, 1973.

CMB argues that it is merely a trade agency and should not be included in the definition of a supplier. It states that it merely informs or accommodates its members in a transaction. Further, CMB argues that including trade organizations in the definition would produce a chilling effect on such organizations and make them warrantors for the performance of their members.

However, it is clear from the facts that CMB's role in the transactions was greater than it represents. The facts indicate that one of the purposes of CMB was to promote the home building industry. To that end, CMB encouraged its members to identify themselves as members and to use promotional material supplied to them by CMB. Further, CMB distributed a brochure to the general public which encouraged the public to contract with CMB members and provided a detailed list of the benefits of doing so. The brochure also represented that each of the members met a rigorous set of standards. CMB also advertised its program in news-

papers. In this respect, CMB operated in the same manner as an advertising agency.

Clearly, CMB, through its use of newspaper advertising and the distribution of its brochure, "solicited" consumers to contract with its member builders. The building of a home is a consumer transaction. See K.S.A. 50-624(c) (defining a consumer transaction as a sale, lease, assignment or other disposition for value of property or services to a consumer or a solicitation by a supplier with respect to any of those dispositions). A party may be a supplier whether or not it deals directly with the consumer. Under the particular facts outlined, we conclude that CMB is a supplier under K.S.A 50-624(i).

CMB's argument that holding it to be a supplier will have a chilling effect on trade organizations and make it a guarantor of the performance of its members is not well taken. CMB is not a guarantor of the performance of its members. However, CMB is responsible for statements it makes in soliciting consumers to contract with its members. CMB did not warrant that its members would do flawless work. However, CMB did represent to consumers that certain benefits would be obtained as the result of contracting with a CMB member builder and that such builders had met certain standards for membership. Such representations fall within the ambit of the KCPA.

CMB argues that it was merely an accommodating party and, thus, should not be termed to be a supplier under *Farrell v. General Motors Corp.*, 249 Kan. 231, 815 P.2d 538 (1991). This argument is not well taken. In *Farrell*, this court held that Hattan, the bodyshop which did warranty work for General Motors but did not sell the vehicle or the warranty to the consumers, was an accommodating party and therefore not liable for a warranty which violated the KCPA. 249 Kan. at 242-43. However, *Farrell* concluded that Hattan did meet the definition of a supplier under the KCPA but was not a supplier to that particular transaction. 249 Kan. at 242. CMB solicited consumers through its advertising and distribution of brochures, and while not dealing directly with consumers, it was a supplier under K.S.A. 50-624(i).

We, therefore, answer the questions certified to us by the United States District Court for the District of Kansas in the following manner:

1. The 1-year limitation period under K.S.A. 60-514(c) does not apply to a claim for civil penalties under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, in a case in which the plaintiff asserts both a civil penalties claim and an actual damages claim under the KCPA.

2. Under the particular facts of this case, defendant CMB is a supplier under K.S.A. 50-624(i).