NOT DESIGNATED FOR PUBLICATION

No. 120,930

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

LINDSEY MADRIGAL,
*Appellee*,

and

DANIEL MADRIGAL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID W. DEWEY, judge. Opinion filed August 21, 2020. Affirmed.

*Terry L. Malone*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellant.

*Brian R. Carman*, of Stinson, Lasswell & Wilson, L.C., of Wichita, for appellee.

Before MALONE, P.J., MCANANY, S.J., and BURGESS, S.J.

PER CURIAM: Daniel Madrigal appeals the district court's decision to increase his child support obligation and impose sanctions under the Kansas Child Support Guidelines § V.B.2. (2020 Kan. S. Ct. R. 93) (Guidelines). He argues that the district court erred in using the extended income formula to recalculate the amount of child support he pays to his ex-wife Lindsey Madrigal for their two children. As for sanctions, which were imposed for not disclosing material increases in his income, he contends that they should be reduced to reflect the earliest that he could have known that his income had increased and to credit him for extra expenses he paid to support the children. He also says that

1

Lindsey's sanctions claim was untimely under the applicable statute of limitations and the doctrine of laches. Finding no reversible error, the district court's decision is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

*The divorce*

Daniel and Lindsey Madrigal divorced in May 2010. Daniel is a self-employed real estate agent; Lindsey, a self-employed hair stylist. They had two children during the marriage—B.L.M. (born in 2003) and B.A.M. (born in 2008). Under a settlement agreement incorporated into the divorce decree, both parents received joint custody of and equal time with the children. Daniel agreed to pay Lindsey $1,500 per month in child support.

The agreement also awarded Daniel the marital residence, three rental properties, and a cabin. For the marital residence, Daniel had to keep it on the market for sale but would keep any profit or loss. When the house later sold for a loss, Daniel took a $40,000 loan to pay off the mortgage. He paid off that loan in 2016. Daniel also assumed all unpaid taxes and penalties that arose during the marriage. A few years later, he agreed to pay the Internal Revenue Service $165,846.42 for unpaid taxes. He also paid about $30,000 in delinquent taxes to the State of Kansas. Because Daniel took on the tax obligation, Lindsey received no spousal support.

The agreement also split many expenses to care for the children. Each parent would pay for half of any childcare expenses; Daniel would keep providing medical insurance for the children; future medical expenses not covered by insurance would be split 80-20 between Daniel and Lindsey respectively; Lindsey would pay for school lunches; and each parent would claim one child as a dependent on their tax return.

2

*Daniel's modification motion*

In December 2010, Daniel asked the district court to reduce child support because "his income ha[d] been reduced by approximately 40% due to the sales decrease in the housing market." On the same day, Daniel filed a child support worksheet stating that his gross annual income was $62,519 and calculating an appropriate monthly child support amount of $799. The court delayed a hearing on Daniel's motion several times until he completed his taxes.

A year later, the district court adopted the parties' agreement to reduce child support to $800 a month. The court applied this new support figure starting January 1, 2011. See K.S.A. 60-1610 (now K.S.A. 2019 Supp. 23-3005[b]).

*Lindsey's modification and sanctions motions*

In March 2017, Lindsey moved to modify child support based on a material change in Daniel's income. After requesting information about Daniel's income, and not receiving any information after several months, Lindsey requested attorney fees for costs she incurred to obtain that information. In early June, the district court temporarily increased Daniel's support obligation from $800 to $1,800 (effective April 1) and set an evidentiary hearing for the modification and attorney fee issues.

Later that month, Lindsey asked the district court to sanction Daniel under § V.B.2. of the Guidelines for not disclosing material changes in his income for several years. Daniel eventually produced his income-tax returns from 2012-2015, but he had not provided his 2016 return as he said it had not yet been prepared. The returns showed that Daniel's income had increased every year since 2012. Lindsey alleged that not disclosing these increases violated Daniel's duty under the Guidelines to notify her of material changes in his income.

3

Lindsey's requested sanctions were based on the dollar value of Daniel's nondisclosure, which equates to the amount by which he had underpaid child support. She attached exhibits that calculated the sanctions by taking the difference between what Daniel would have paid in child support had disclosure occurred and the amount he actually paid. The exhibits included two sets of calculations for what Daniel should have paid. The first set used the highest monthly income capped income figure on the child support schedules in the Guidelines. The second used an uncapped figure, which reflected actual monthly income which exceeded the highest figure on the schedules. She then calculated a capped and uncapped sanction for each year in which Daniel's income materially increased without disclosure by comparing the amount he would have paid to the amount he did pay.

Lindsey calculated the 2016 and 2017 sanctions using Daniel's 2015 income because she had not received his income information for those years. For 2012 and 2013, she did not include an uncapped sanction because the parties' combined income was still below the highest amount on the schedules at that point. And she split 2017 into two periods—January to March and April to June—because the district court had temporarily increased Daniel's support amount effective April 1.

The table below shows the capped and uncapped sanction amount that Lindsey proposed for each year based on Daniel's taxable income on his Kansas returns:

| Year | Daniel's Income | Capped Sanction | Uncapped Sanction |
|---|---|---|---|
| 2012 | $96,207 | $2,192 | N/A |
| 2013 | $120,688 | $4,740 | N/A |
| 2014 | $201,646 | $11,916 | $14,328 |
| 2015 | $267,162 | $12,576 | $20,016 |
| 2016 | (2015 income) | $14,052 | $21,696 |
| 2017 (Jan. – Mar.) | (2015 income) | $3,513 | $5,424 |
| 2017 (Apr. – June) | (2015 income) | $513 | $2,424 |

4

The calculations used the same income figure of $15,800 for Lindsey each year, which is an imputed income figure that reflects the amount a person would earn working 40 hours a week at the federal minimum wage.

Lindsey's calculations produced a total capped sanction of $49,502 and a total uncapped sanction of $63,888. Lindsey also requested an increase in child support to $1,971 per month to reflect Daniel's higher income. The district court added the sanctions motion to the list of issues it would decide at the evidentiary hearing.

*The evidentiary hearing*

At the hearing in November, Lindsey testified that she had contacted her attorney about child support modification because she had noticed a change in Daniel's lifestyle. He had built a new home and bought an RV and a boat. At some point in 2017, she had asked Daniel about whether his income had changed and if he should pay more child support. She said that Daniel's response was no and "that if [she] tried, [she] would actually get less child support."

Lindsey also testified that about a month before the hearing she bought a house; she said that she could do so because of the recent increase in child support. Daniel lives in Derby, where the children attend school. That is about half an hour from where Lindsey used to live on the other side of Wichita.

When Daniel testified, he said that an accountant prepares his taxes every year. Sometimes Daniel received an extension on his taxes, filing them in October rather than April. According to Daniel, he never knows what his income and reasonable business expenses are until his accountant finishes his tax return each year. Because he is self-employed, paid on commission, and the real estate market fluctuates month-to-month, Daniel said he cannot know in advance what his income will be each year. He agreed that

5

many self-employed parents pay child support and that it would be fair that "when [his] income is up, [his] child support the following year would be higher," and that if he had a down year financially, his "child support obligation the year after that would be down."

Daniel also testified about his annual income from 2012 to 2015. These numbers varied slightly from the numbers that Lindsey used to calculate sanctions, but they were similar:

| Year | Income Used to Calculate Sanctions | Income From Daniel's Testimony |
|---|---|---|
| 2012 | $96,207 | $98,475 |
| 2013 | $120,688 | $119,974 |
| 2014 | $201,646 | $201,760 |
| 2015 | $267,162 | $258,000 |

The parties testified at length about disputes over who had paid certain expenses for the children over the years. Both parents said that they had paid for clothes, school supplies, cell phones, and school enrollment fees. Lindsey said that she had paid for musical instruments and lessons for the children. Under a 2013 court order, Lindsey paid for any activities the children did at the YMCA, but both parents split any other activities. Daniel signed B.A.M. up for a football team and a traveling baseball team not at the YMCA. Lindsey had objected to enrolling B.A.M. because these activities were too expensive. Daniel had objected to enrolling B.L.M. in a gymnastics class on Lindsey's side of town.

Daniel estimated that on top of his monthly child support payments, he was paying around $800 every month in expenses to provide for the children. He provided some receipts as examples of clothes and school supplies he had bought over the years. Neither

he nor Lindsey kept precise information about how much they spent on the children. All the expenses Daniel specifically listed totaled about $4,000.

*The district court's initial findings*

About a month after the hearing, the district court issued a written order stating its findings. It found that Daniel's income had jumped every year since 2012 without an attendant increase in his child support obligation. By not disclosing these increases to Lindsey, the court determined that Daniel had enjoyed a better lifestyle at the children's expense. Although the court imposed no sanctions for 2012 and 2013, it imposed the capped sanctions that Lindsey had proposed for 2014 to 2017:

| Year | Sanction Amount |
|------|-----------------|
| 2014 | $11,916 |
| 2015 | $12,576 |
| 2016 | $14,052 |
| 2017 (Jan. – Mar.) | $3,513 |
| 2017 (Apr. – June) | $513 |

In all, the district court imposed $42,052 in sanctions, which was inexplicably less than the requested sanctions in Lindsey's chart that totaled $42,570. The district court also assessed $1,500 in attorney fees to Lindsey for her efforts to get Daniel's 2016 tax return. The total amount assessed against Daniel was $43,552.

The court also increased Daniel's monthly child support obligation to $1,971, effective July 1, 2017. The new support figure used Daniel's 2015 income ($267,194) and applied the highest monthly income amount on the child support schedules. The district court filed a journal entry in July 2018 reflecting the findings from its written order.

*The motions to alter or amend*

A flurry of motions followed. In early August 2018, both parties asked the district court to amend its judgment. Lindsey filed her motion first. She said that a few days after the district court submitted its journal entry, she received Daniel's 2016 tax return and "year-end proof of income" for 2017. From those documents, Daniel's 2016 income was "near double" the 2015 figure that the district court had used to calculate future child support and sanctions for 2016 and 2017. A worksheet Lindsey prepared listed Daniel's 2016 income as $519,356. Lindsey asked the court to recalculate sanctions and child support using the new income information.

A few days later, Daniel asked the district court to amend the judgment. His motion asked the court to modify its findings to account for direct expenses he paid for the children over the years and to calculate his responsibility for sanctions based on the earliest time he could have known that his income had increased, which was when his tax returns were prepared.

In late August, after a hearing on the motions, the district court amended its findings and increased sanctions for 2016 and 2017:

| Year | Original Amount | New Amount |
|------|-----------------|------------|
| 2014 | $11,916 | $11,916 |
| 2015 | $12,576 | $12,576 |
| 2016 | $14,052 | $15,072 |
| Jan.-Mar. 2017 | $3,513 | $3,768 |
| Apr. -June 2017 | $513 | $768 |

With these changes, the total sanctions increased from $42,052 to $44,100 and the total judgment increased from $43,552 to $45,600. The district court also increased Daniel's child support payments to $4,164 per month, retroactive to July 1, 2017. The district court later filed a longer order restating its findings.

8

Daniel asked the district court to reconsider its decision again in early September, restating the arguments from his earlier motion. In October, Daniel moved to decrease child support to $1,715 because his income had declined. As shown by a worksheet attached to the motion, he calculated that number using an income figure of $342,770 listed on his 2017 tax return.

In early November, Daniel filed a memorandum that fleshed out the arguments in his reconsideration motion. He attached an exhibit that recalculated the sanctions, reducing the amount imposed each year by starting the sanctions on the day he filed his taxes that year. Under that calculation, the total sanction would be $23,450 rather than $44,100.

In late January 2019, the district court denied Daniel's motion. The court first explained that it had credited Daniel for his contributions to the children's direct expenses by using capped income when calculating sanctions and by denying most of the attorney fees that Lindsey requested. The court declined to adjust the sanctions based on when Daniel filed his taxes each year. The evidence, the court explained, showed that "[h]e was alerted of the increase in his income as he received it" and could have taken "the steps necessary to stay apprised of his increased income as it was happening."

The district court also issued a handwritten order on the same day it denied Daniel's motion. The order found that the appropriate income to use for Daniel's child support was $342,000—an approximation from his 2017 tax return. In calculating support, the court found that "circumstances exist to warrant extrapolation as to [Daniel]'s income." So the court adopted a modified version of a child support worksheet Lindsey's attorney had prepared, effective November 1, 2018. The court asked Lindsey's attorney to prepare an updated worksheet and for Daniel's attorney to provide a journal entry reflecting the court's findings. Neither document is in the appellate record.

Daniel appealed the district court's decision on sanctions and the amount of child support.

ANALYSIS

This appeal boils down to the issues of child support and sanctions. Although Daniel's brief lists five issues, all of them relate to the amount of support or sanctions. His arguments have been reorganized based on these two issues. This section addresses the child support issue first because it involves some background principles that will make it easier to understand the sanctions issue.

I. *The district court properly used the extended income formula to calculate child support.*

Daniel challenges the district court's decision to apply the extended income formula when calculating his new child support obligation effective November 1, 2018. He first argues that the district court had to make specific written findings explaining its decision to use the formula but failed to do so. He also argues that no evidence supported a finding that applying the formula served the children's best interests and that the evidence does show that doing so granted Lindsey a windfall.

In reviewing the amount of child support awarded, this court reviews for abuse of discretion. Unless the district court commits legal or factual error, it abuses its discretion only if no reasonable person would agree with its decision. If Daniel's argument requires interpreting and applying the Guidelines, this court exercises unlimited review over such questions. See *In re Marriage of Johnson*, 50 Kan. App. 2d 687, 691-92, 336 P.3d 330 (2014). Factual findings, on the other hand, must be supported by substantial competent evidence that is such legal and relevant evidence that a reasonable person might accept as

supporting a conclusion. *In re Marriage of Atchison*, 38 Kan. App. 2d 1081, Syl. ¶ 3, 176 P.3d 965 (2008).

To put into focus the district court's use of the extended income formula, it is useful to review the basics of the child support guidelines. The Guidelines calculate child support using tables that list the average monthly cost of raising a child, according to an economic model, based on the number of children to be supported, the children's ages, and the parents' combined gross monthly income. See Guidelines § II.C. Income on the schedules is capped, meaning it maxes out at a certain amount. See Guidelines, Child Support Schedules, Appendix II.

If the parents' combined income exceeds the cap, the district court has a choice. It can calculate support using the schedules by assigning the parents the highest amount on the relevant table even though their true income exceeds that amount. In the alternative, it can apply what's known as the extrapolated or extended income formula. (For simplicity's sake, the extended formula.) See Guidelines § III.B.3. Under the extended formula, monthly income is uncapped. If the district court applies the extended formula, it would calculate support using the parents' actual income rather than the artificial cap. Although the district court must consider using the extended formula if monthly income exceeds the cap, the ultimate decision on whether to apply it is discretionary. *In re Marriage of Patterson*, 22 Kan. App. 2d 522, Syl. ¶ 2, 920 P.2d 450 (1996).

If the court applies the capped schedules, a rebuttable presumption arises that the amount of support they recommend is appropriate. To deviate from that presumptive amount, the court must either fill out a section of the child support worksheet on adjustments or make other "specific findings on the record" in a journal entry stating its reasons for deviating. *Matter of Marriage of Schletzbaum*, 15 Kan. App. 2d 504, Syl. ¶ 3, 809 P.2d 1251 (1991). No presumption arises, however, if the court instead applies the extended formula. *Patterson*, 22 Kan. App. 2d 522, Syl. ¶ 1.

Daniel argues that the district court must make specific written findings justifying its reliance on the extended formula. Because it did not, Daniel says the modified child support figure must be vacated and the case remanded for a new calculation using the capped schedules. Lindsey responds that even if the district court did not explain its decision to use the formula at first, later orders rejecting Daniel's motions to alter or amend did.

Daniel's argument fails because no specific findings were required here. The cases Daniel cites all involve the findings required to deviate from a presumptive-support figure based on the capped schedules. No case he cites applies that same rule to the discretionary decision to award support beyond the cap using the extended formula.

So long as the district court awards at least the presumptive amount of support, the Guidelines themselves do not require written findings to use the extended formula. The Guidelines require written findings "to make an adjustment" from the presumptive figure recommended by the schedules. See Guidelines § I. One way the district can satisfy that requirement is by completing the portion of the child support worksheet (Section E) that covers adjustments. See Guidelines § I. Doing so "constitute[s] the written findings for deviating from the rebuttable presumption." See Guidelines, § I. Written findings in that situation are required because a departure from the presumptive amount is a disagreement with the default support number that the economic model and the Guidelines say is reasonable under the circumstances. One would expect that such a decision would require a more thorough, written explanation.

The same cannot be said about the discretionary decision to use uncapped income. There is no presumption that the support amount calculated by the extended formula is appropriate. See *Patterson*, 22 Kan. App. 2d 522, Syl. ¶ 1. The purpose of requiring more

12

explanation disappears when the district court is simply deciding whether to apply the extended formula as opposed to deviating from a presumptively correct figure.

This view tracks the two published cases in Kansas that have considered the extended formula's use. The first case articulated the principles mentioned earlier: (1) the decision to apply the formula when income exceeds the cap is discretionary; (2) the district court must at least consider using the extended formula; and (3) there is no presumption that the support amount recommended by the extended formula is appropriate. See *Patterson*, 22 Kan. App. 2d 522, Syl. ¶¶ 1-2. It has been determined that cases using specific findings "dealt with deviations from the presumptive payment established in the support schedules," not with "a monthly income higher than that found on the support schedules." 22 Kan. App. 2d at 529.

The other published case involved a cap of a different kind. In *In re Marriage of Leoni*, 39 Kan. App. 2d 312, 180 P.3d 1060 (2007), the parents' combined monthly income exceeded the max number on the schedules, and the district court applied the extended formula. But then the district court took the support amount produced by the extended formula and applied an adjustment on the child support worksheet for "Overall Financial Condition" to cap support so it never exceeded $5,000 a month. Because the financial-condition adjustment is an adjustment from the presumptive amount, the district court needed to make specific written findings. It did so by completing Section E on the worksheet and making other detailed findings in a journal entry. 39 Kan. App. 2d at 322-23.

Daniel also cites a statute to support his written findings requirement. As relevant here, that statute requires that the district court in a case tried without a jury state its factual findings and legal conclusions "on the record after the close of evidence" or "in an opinion or a memorandum of decision." K.S.A. 2019 Supp. 60-252(a)(1). That statute no more supports a written findings requirement to utilize the extended formula than the

13

Guidelines do. The findings required by K.S.A. 2019 Supp. 60-252(a) facilitate appellate review. They ensure that the district court sufficiently articulated the basis for its decision and the standards it applied. *Gannon v. State*, 305 Kan. 850, Syl. ¶ 4, 390 P.3d 461 (2017). As Lindsey points out, the district court did that here.

The district court first applied the extended formula in its August 2018 order modifying the judgment based on the new information about Daniel's 2016 taxes and 2017 year-end income. Lindsey acknowledges that this order did not explain applying the formula. But in a handwritten order in January 2019, the district court found that "circumstances exist[ed] to warrant extrapolation as to [Daniel's] income." To be sure, the district court never articulated what those circumstances were. But it at least explained that it had applied the formula and that it found circumstances warranting that decision. That was enough to notify the parties and this court of the basis for its decision and allow for meaningful appellate review.

All that is left, then, is to see if the evidence that is in the record supports the district court's finding that circumstances justified application of the extended formula. Daniel says that it does not because there is no evidence that the children's lifestyles have been harmed while he has paid support under the capped schedules. Instead, he argues, the evidence shows that using the extended formula to calculate support has granted Lindsey a windfall.

There is some authority that supports Daniel's argument that courts wrestling with whether to apply the extended formula must consider factors like the ones Daniel mentions. *In re Marriage of Guha*, No. 119,312, 2020 WL 3023389, at *7 (Kan. App. 2020) (unpublished opinion), proposes that district courts deciding whether to extrapolate income must balance factors like the children's standard of living without parental separation and the potential of awarding a windfall. However, it should be noted that *Patterson* emphasizes the "wide discretion" and "very wide discretion" district courts

14

possess in setting child support when income exceeds the cap. 22 Kan. App. 2d at 530-31. While a district court may end up considering the children's standard of living and windfalls, neither the Guidelines nor precedent mandate it.

The record supports a finding that the extended formula is appropriate. The evidence showed that there was a significant disparity in the standard of living the children enjoyed at Daniel's house compared to at Lindsey's. Her income is substantially less than his, and she was unable to afford to pay for all the extras that he could. She testified that if support increased, she could. Until a month before the evidentiary hearing, Lindsey could not afford to buy a house. She said that she was only able to do so because the court had increased support. Even though Daniel claims that the children's standard of living did not suffer, it is obvious that they would have enjoyed a higher standard of living if he had paid child support at a higher level. His silence deprived them of that.

It is not hard to imagine how a child's relationship with one parent could be strained under these circumstances. Nor is it hard to imagine the emotional toll that a significant wealth disparity between parents could inflict on a child. *In re Marriage of Wilson*, No. 104,830, 2011 WL 4717202, at *6 (Kan. App. 2011) (unpublished opinion), affirmed the district court's findings that a large income gap between parents could affect their child's emotional condition because one parent "would only be able to provide for [the child's] minimum needs while [the other] would be able to provide . . . superior living conditions and more travel, educational, and recreational opportunities." The evidence in this case supported a finding that the income disparity between Daniel and Lindsey justified reliance on the extended formula.

Daniel argues that using the extrapolation formula grants Lindsey a windfall rather than addressing any disparity in the children's standard of living. To prove his point, he claims that Lindsey has been taking vacations without the children and generally using child support to support her lifestyle. Daniel provides no record cite for that claim in the

argument section of his brief. He does provide a cite in the facts section, but that cite is to a memorandum in support of his motion to alter or amend. The only mention of this claim in that document is not supported by reference to any evidence either. Although Daniel's appellate brief says that he presented evidence on this allegation at a hearing on his motion, he did not include that evidence or a transcript from the hearing in the appellate record. Because he cites no other evidence of a windfall, this argument fails.

All in all, the district court could have done a better job specifically articulating what "circumstances exist[ed]" to use the extended formula. Still, the record supported a finding that the formula should be used because it would ensure that the children had a similar lifestyle at both parents' homes. For that reason, the district court did not err in applying the extended formula for future child support payments.

Even if the district court failed to adequately explain its reliance on the extended formula, the remedy would not, as Daniel suggests, be "to remand the case . . . to calculate child support [based on] the child support schedules and not extrapolate beyond them." If the district court erred by not making written findings, a remand directing the district court to supply those findings would cure the error. The district court might decide to use capped income on remand, but there is no reason it could not simply issue new written findings justifying its decision and applying the extended formula again.

II. *The district court did not abuse its discretion in imposing sanctions under § V.B.2. of the Kansas Child Support Guidelines.*

The other issues Daniel appeals all relate to the district court's decision to impose sanctions under § V.B.2. of the Guidelines. That provision permits sanctions against a parent who "fail[s] to disclose a material change of circumstances." Guidelines § V.B.2. A neighboring provision lists some circumstances that are material and thus trigger the disclosure requirement. One is the so-called 10% Rule, which provides that any

"[c]hange of financial circumstances . . . which would increase or decrease by 10% the amount shown on Line F.3 of the worksheet." Guidelines § V.B.1. Another is "[a] parent shall notify the other parent of any change of financial circumstances including . . . income, . . . which, if changed, could constitute a material change of circumstances." Guidelines § V.B.1. If a material change occurs and a parent fails to disclose it, § V.B.2. applies.

Section V.B.2. encourages compliance with the disclosure duty. It allows the district court to assess "the dollar value of a party's failure to disclose" as a credit on Line F.3 of the child support worksheet, or as "an amount in addition to Line F.3 . . . for a determinate amount of time."  See Guidelines § V.B.2. The district court may also impose "other sanctions."  See Guidelines § V.B.2. To impose either type of sanctions, the nondisclosure need not be willful. On appeal, this court reviews the decision to impose sanctions under § V.B.2. for abuse of discretion. *Johnson*, 50 Kan. App. 2d 687, Syl. ¶ 3.

The sanctions here stemmed from Daniel's failure to notify Lindsey for several years that his income had materially increased. Daniel challenges the sanctions on three grounds. First, he argues that the district court should have limited sanctions to the earliest date that he could have known that his income had increased each year. In his line of work, he says that date is when he files taxes each year. Second, he requests a reduction in sanctions to credit him for direct expenses he paid to support the children beyond his monthly obligation. Last, he claims that Lindsey cannot receive any sanctions because her claims were untimely under the relevant statute of limitations and the doctrine of laches.

17

A. *Limiting sanctions to when Daniel filed his taxes*

Daniel first argues that sanctions should be limited to the date on which he filed his taxes every year because that is the earliest he could have known that his income had materially increased. As a self-employed real estate agent, Daniel explains, his income fluctuates from year-to-year (and even month-to-month). So unlike a salaried employee, he cannot predict his annual income in advance. Instead, he must wait to know what his income was from a previous year until his accountant files his taxes the following April (or October if he files an extension). He reasons he could not know before that date each year that his income had materially increased. The district court imposed a sanction for the entire calendar year of each year of sanctions. He asks this court to start sanctions each year on the date he filed his taxes, reducing the total sanction from $44,100 to $23,450.

Lindsey responds that the evidence shows that Daniel was aware of his income as he received it. The district court, she notes, rejected Daniel's claim because he reasonably would have noticed that his income was going up and he could have stayed current with the information about his finances.

Daniel's argument is belied by the record, which shows that he could anticipate potential material changes before filing his taxes. For example, Daniel moved to decrease child support in December 2010 because "his income ha[d] been reduced by approximately 40% due to the sales decrease in the housing market." Daniel offers no reason why he can know by year end that a material decrease has occurred but not a material increase. Presumably, all the same reasons he cites for not knowing that a material increase has occurred until he files his taxes would equally apply to a decrease.

It is true that back in 2010, the district court delayed final consideration of Daniel's modification motion until he filed his taxes. But that only strengthens the case that year-

18

end disclosure is possible. He moved for modification based on a material change in December, citing an approximation of how much his income had declined that year. The district court then waited to decide his motion until he had filed taxes. Although the district court did not grant the motion until a few months later, the new and reduced support figure was retroactive to the month after he filed his motion. See K.S.A. 2019 Supp. 23-3005(b). There is no reason a similar process could not occur when his income spikes by tens of thousands of dollars (or almost doubles, as it did in 2016).

Daniel emphasizes that as a self-employed parent, his income under the Guidelines includes his reasonable expenses, which he cannot know until his taxes are filed. Again, this presumes that he must wait to have absolute certainty until his duty to notify under § V.B.2. activates. As he agreed when asked at trial, "plenty of self-employed people in this world . . . pay child support"; and it is only "fair . . . that when your income is up, your child support the following year would be higher" and "if you happen to have a down year, . . . your child support obligation the year after that would be down." Daniel's income for some of the years in question grew significantly and in some years it was essentially double the prior year's income. Seemingly, such large increases in income would be obvious during the taxable year to the person earning the income in those years. Such awareness is supported by Daniel's generous spending habits and lifestyle changes, which were obvious enough to generate the inquiry by Lindsey into Daniel's income. Furthermore, Daniel's assertion that his duty to disclose goes into effect only after his taxes were filed and his income was determined as a sum certain is not persuasive when he failed to disclose his income for those years he had filed tax returns and substantial increases in his income were established. The district court did not abuse its discretion in calculating sanctions under § V.B.2. for each year based on Daniel's income as he received it.

19

B. *Crediting direct expenses*

Daniel also argues that the district court should have reduced the sanctions by crediting him for expenses he paid to support the children over the years. For example, he testified at the evidentiary hearing that he spent about $800 each month on the children on top of his monthly child support payments. In his view, the district court should have accounted for these expenses when it calculated the sanctions. By not doing so, Daniel says that Lindsey received a windfall.

This argument relates to the amount of sanctions imposed. We review that issue for abuse of discretion. See *Johnson*, 50 Kan. App. 2d at 694 (noting that the decision to impose sanctions is discretionary and remanding for the district court to, among other things, "determine the proper amount of the sanction consistent with the provisions of the guidelines"). Daniel alleges no legal or factual error in the decision, so he must show that it was unreasonable. 50 Kan. App. 2d at 691-92.

There are at least two problems with Daniel's argument. First, the district court did credit Daniel for the extra expenses he paid over the years. The court's January 2019 order explained that it had considered these expenses in calculating sanctions by using capped rather than uncapped income to calculate sanctions and by denying Lindsey most of her requested attorney fees. Using capped income reduced the total sanctions by at least $14,386, much more than the about $4,000 in specific expenses that Daniel testified about at the evidentiary hearing. The $14,386 figure is likely low because it reflects Lindsey's initial sanctions request before receiving Daniel's 2016 and 2017 financial information.

Second, Daniel has not shown that a windfall occurred. He cites no evidentiary support for his claim that the sanctions granted Lindsey a windfall, other than the

20

allegation about her taking vacations using child support money. As previously discussed, there is no evidence in the appellate record to support that allegation.

In sum, a reasonable person could agree with the district court's decision to credit Daniel for extra expenses he paid beyond his support obligation by denying most of Lindsey's attorney fees and using capped income to calculate sanctions. Daniel's argument must fail.

C. *The timeliness of sanctions*

Daniel last contends that Lindsey cannot receive any sanctions because her claim to recover them was untimely under K.S.A. 60-514(c)'s one-year statute of limitations and the doctrine of laches. The district court declined to apply either because doing so was "contrary to appellate opinions which upheld the imposition of sanctions without applying a time limitation."

Daniel claims that the sanctions are barred by the one-year statute of limitations in K.S.A. 60-514(c). That provision sets a one-year limitations period for "action[s] upon statutory penalty or forfeiture." Daniel argues it applies because § V.B.2. sanctions are a "statutory penalty," meaning Lindsey had to bring her claim within one year of that claim arising. Because she did not, he asks this court to vacate the sanctions as untimely.

Addressing Daniel's argument requires interpreting K.S.A. 60-514(c) to determine the definition of a "statutory penalty" as used in that section. We exercise unlimited review when interpreting statutes. *State v. Dooley*, 308 Kan. 641, 647, 423 P.3d 469 (2018). The cardinal rule of statutory interpretation is that the intent of the Legislature governs if it can be determined. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). If, as is the case here, the Legislature has not defined a statutory phrase, courts "ascertain legislative intent by giving common words their ordinary meaning." *Dooley*,

308 Kan. at 656. Because "dictionary definitions are good sources for such common meanings," 308 Kan. at 656, Black's Law Dictionary provides excellent guidance.

Black's defines a "statutory penalty" as "[a] penalty imposed for a statutory violation; esp., a penalty imposing automatic liability on a wrongdoer for violation of a statute's terms without reference to any actual damages suffered." Black's Law Dictionary 1368 (11th ed. 2019). Under that definition, the penalty itself need not be found in a statute so long as it imposes automatic liability for noncompliance with a statute. However, a claim which arises from a statute does not automatically constitute a penalty or forfeiture which would trigger a one-year statute of limitations. *Four B Corp. v. Daicel Chemical Industries, Ltd.*, 253 F Supp. 2d 1147, 1154-55 (D. Kan. 2003).

There is a clear distinction between a penalty as contemplated by K.S.A. 60-514(c) and a liability created by a statute as contemplated by K.S.A. 60-512(2). K.S.A. 60-512(2) provides for a three-year limitations period for "[a]n action upon a liability created by a statute other than a penalty or forfeiture." "[A]n action seeking a 'penalty or forfeiture' is plainly excluded by K.S.A. 60-512(2) and plainly included by K.S.A. 60-514(c)". *O'Brien v. Leegin Creative Leather Products, Inc.* 294 Kan. 318, 353, 277 P.3d 1062 (2012). Under both provisions, noncompliance with a statute creates liability.

One case that discusses the distinction between the one-year and three-year statute of limitations is *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 1 P.3d 899 (2000). *Alexander* involved a certified question from a federal court as to whether the one- or three-year limitations period applied to consumers' claims for both statutory penalties and actual damages under the Kansas Consumer Protection Act (KCPA). The KCPA allows consumers who suffer a violation of the act to recover the greater of damages or a civil penalty. K.S.A. 50-634(b). The civil penalty allowed up to $10,000 for each violation of the KCPA. K.S.A. 50-636(a).

22

The Kansas Supreme Court determined the three-year period applied because the KCPA allows a consumer to recover the greater of the civil-penalty amount or actual damages. 268 Kan. at 823-24. The court explained that the KCPA really provided a single, compensatory remedy: the greater of actual damages or the statutory penalty. Because that sole remedy was more remedial than punitive, the one-year period in K.S.A. 60-514(c) did not apply and the three-year period in K.S.A. 60-512(2) did. Importantly for this case, the court emphasized that the one-year period would have applied "if the legislature had chosen to provide only a penalty for a violation of the KCPA or . . . had provided for a separate penalty in addition to a damage recovery." 268 Kan. at 824.

The definition of a penalty under K.S.A. 60-514(c) is consistent with the definition of a penalty found in Black's Law Dictionary. The sanctions awarded to Lindsey are not consistent with that definition. There is no statute which provides for a monetary penalty for failure to disclose a material change in income.

Furthermore, both K.S.A. 60-514(c) and K.S.A. 60-512(2) speak in terms of a penalty or liability arising as a result of a specific statutory violation. Sanctions under § V.B.2. of the Guidelines fall outside that purview. Courts impose sanctions for violating the Guidelines, not a statute. The Guidelines are authorized by statute but are not themselves statutory. See K.S.A. 2019 Supp. 20-165(a). No Kansas statute imposes a duty on parents paying child support to disclose a material change in financial circumstances. The closest any statute gets is K.S.A. 2019 Supp. 23-3005(a), which simply grants the district court continuing jurisdiction to modify the amount of child support if a "material change in circumstances" occurs. But that provision does not require one parent to notify the other when a material change occurs. Only § V.B.2. of the Guidelines does that. A parent would not violate K.S.A. 2019 Supp. 23-3005 (or any other statute) by not disclosing a material change.

Daniel cites a case that uses "sanctions" interchangeably with "statutory penalty." In *Richardson v. Murray*, 54 Kan. App. 2d 571, 573, 402 P.3d 588 (2017), a panel of our court affirmed "the district court's decision to grant the Murrays' motion for sanctions in the form of a statutory penalty and attorney fees." But the sanction in that case penalized a statutory violation for the failure to file a satisfaction of judgment as required by K.S.A. 2019 Supp. 60-2803. Clearly a monetary penalty for noncompliance with a statute is distinguishable from sanctions imposed for violating the Guidelines.

Next, Daniel contends that sanctions are barred by the doctrine of laches. Laches is an equitable principle that bars stale claims. It applies if a party's untimely assertion of a right or claim causes prejudice to an adverse party. For laches to apply, the party invoking it must show prejudice from an adverse party's failure to assert a right for an unreasonable length of time. This court reviews a district court's decision on whether to apply laches for abuse of discretion. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, Syl. ¶ 17, 22 P.3d 124 (2001). Because Daniel alleges no factual or legal error in the district court's decision not to apply laches, he must show that no reasonable person would agree with it. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

Daniel maintains that laches should have applied because Lindsey's failure to assert her sanctions claim for several years prejudiced him. He says that she was on notice that his income was increasing and should have asked for his financial information sooner. He reasons, she knew that he filed taxes each year and could have asked for information about his income.

A reasonable person could agree with the district court's decision not to apply laches because there is evidence that supported a finding that the delay in requesting sanctions was neither unreasonable nor unexplained. Lindsey requested sanctions about four years after Daniel's income started materially increasing and only after Daniel's lifestyle changed in an obvious way. That is much less than the 12-year delay in the case

24

that Daniel cites to support his argument. See *In re Marriage of Jones*, 22 Kan. App. 2d 753, Syl. ¶ 3, 921 P.2 839 (1996). *Jones* is further distinguishable in that the amount of child support the payee claimed was known to the parties for the entire 12 years; the payee never made a claim for arrearages in any of the numerous hearings conducted in the case over the 12 years; and the payee's claim was not based on an increase in the payor's income occurring during those 12 years.

*Jones* and the cases cited therein discus the equitable nature of laches.  Laches applies when it is inequitable to compel payment where there has been a delay in asserting rights to such payment for an unreasonable amount of time. Daniel's argument is basically that Lindsey had the burden of investigating Daniel's income when the converse is true that he had the obligation to disclose his income pursuant to the Guidelines. If Daniel had made the disclosure required of him, it is more than likely that Lindsey would have pursued the matter. If she did not, then that would be a problem of Lindsey's own making. It is hard to see how the equities would balance in Daniel's favor in this case.

Against this evidence, Daniel offers two reasons why Lindsey should have known that his income had increased. He first claims that Lindsey "obviously knew that both she and [Daniel] had an obligation to file income tax returns each year." Nothing is offered to show how Lindsey would divine that Daniel's income had increased based on the fact that he had to file an income tax return.

Daniel also argues that Lindsey should have known that his income had increased based on language from the parties' 2013 parenting agreement. That language required him to pay Lindsey within 60 days of filing his taxes for "any and all tax offset due and owing." Daniel does not explain what information regarding these payments would put Lindsey on notice that his income had increased. She was not asked about them at the hearing, and they are not in the appellate record. Daniel provides no evidentiary support

25

for his claim that the tax offsets language in the 2013 agreement shows that Lindsey knew that his income had increased before she filed sanctions in 2017.

The district court did not err in finding that the one-year statute of limitations did not apply, and it did not abuse its discretion in finding that laches did not apply.

Affirmed.